SUCCESSION OF JOHN McDONOGH.—ON THE PETITION OF MOSES FOX.

18  419
52 1195

18  419
110 616
18  419
e114 615

The rules of Louisiana law, relating to the opening and proving of wills, apply to the preliminary proceedings necessary to the administration of estates, which are not conclusive upon those instituting them or the parties cited or present; so as to estop them from subsequently contesting the validity of a will, unless at the time of probate its validity was expressly put at issue. On the other hand, if at the time of probate the genuineness of the will is denied, the party seeking its execution must produce the kind of evidence necessary to counterbalance the express denial, and establish its validity.

The law has fixed the kind and measure of the evidence necessary to the preliminary proof of an olographic will; the testimony of two credible persons, who shall have become familiar with the handwriting of the testator by having seen him often write and sign; not only sign his name, but write other matter besides his name, and who shall attest, solemnly declare that they recognize the testament as being entirely written, dated and signed in the testator's handwriting; it must be acknowledged and proved by them; they must recognize the handwriting of the testator, and declare the whole instrument, date body and signature, to be in his handwriting. (O. C. 1648.)

All evidence of handwriting, except where the witness saw the document written, is presumptive and rests upon the principle of comparison, which is made in two ways: by comparing with the exemplar formed in the mind by previous knowledge, or with other writings produced on the occasion, and proven or admitted to be genuine; and at best is merely evidence of opinion, which admits of various degrees, and the weight of which is to be determined by the Court.

If the party against whom the act under private signature is produced, disavows the signature, or the heirs or other representatives declare that they do not know it, it must be proved by witnesses or comparison, as in other cases.

If the defendant deny the signature or contend that it is counterfeited, the plaintiff must prove the genuineness of such signature, either by witnesses who had seen the defendant sign the act, or who declare that they know it to be his signature, because they have frequently seen him write and sign his name. But the proof by witnesses shall not exclude the proof by experts, or by a comparison of the writing, as established in the Civil Code.

The principle recognized in the application of this rule of law is, that the express denial of a signature to a private writing, or the charge that it is counterfeited has some weight, and imposes upon the party seeking to enforce the obligation, the burden of counterbalancing its effect by the kind of evidence prescribed.

Judges should receive the truth from the hands of the law and in the form which it has established; but it is equally their duty to be fully satisfied that what is offered in such form is really truth. It comprehends the principle which this Court is constantly applying, that a plaintiff must make his case not merely probable, but legally certain.

APPEAL from the Second District Court of New Orleans, *Bermudez, J.* Pierre Soulé, R. K. Cutler and Ed. Filleul, for Fox, plaintiff and appellant. C. Dufour, Randall Hunt and Geo. L. Bright, City Attorney, for defendants. C. Roselius and Robert Mott, for city of Baltimore.

*Pierre Soulé, for plaintiff and appellant.*\*—May it please the Court: If bold assertions, unsupported by any authority of law or fact; if unbridled abuse and vituperation poured unsparingly upon a modest and humble litigant pleading at the bar of his country, and invoking the majesty of its laws in vindication of his rights and honor, have to be accepted as a legitimate substitute for all want of reason and justice in those who so unmercifully assail him; if a tone of overbearing arrogance and of affected conviction is to supersede all necessity of justification for the reckless and

\* The briefs of the other counsel were not found.

odious calumnies heaped upon his devoted head, then, verily, has his case come to serious peril, and well might his counsel spare himself the ungrateful task of engaging in the desperate contest.

But, sirs, I shall never believe that such a subversion of all decency and rule has any chance of finding encouragement and support with your Honors.

As long as a litigant, however crushed by poverty and misfortune, shall have permission to appear in a Louisiana Court of Justice, and his counsel be allowed to speak for him before Louisiana Judges, I will feel assured that the stern independence and impartiality which have ever directed and swayed your judicial councils, will not be disconcerted, either by the artifices, of a dazzling eloquence or by the shifts of deceptive arguments, or the violent appeals to the prejudices and passions which sometimes invade and blind a fictitious and versatile public sentiment.

We, sirs, have planted our case upon a wider and more solid foundation; upon the foundation of truth and justice, the only guides, we thought, that your Honors, as well as ourselves, could safely acknowledge and follow.

While the stoical composure and firmness with which our client has been facing the storm of invective, which has raged around him since the inception of this suit, was giving us, every day, fresh and encouraging evidence of his unshaken faith in the verity and sacredness of his title, we, his advisers and defensors, were looking, not without some anxiety, but with increasing confidence and security, to the moment when we would be afforded an opportunity of unfolding to you the tale of this controversy, so strangely misrepresented in the pleadings and arguments of our adversaries.

There never was, probably, a history of any litigation more skilfully worded on one side, nor more modestly presented on the other, than that which your Honors must have found in the two splendid briefs placed in your hands by the two eminent counsels, to whose talents and ingenuity they are due. One of them is from that gifted and justly admired barrister, now absent from us, whom we all admire and respect, and the other, the spontaneous emanation of an unpretended but transcendent intellect, which gives such bright promise of a glorious future to my much esteemed friend and colleague, Mr. Filleul.

In them, your Honors will find all the elements which have supplied the accomplished and intrepid jousters with the occasion for displaying their genius and dexterity. In both is salient the deep sense entertained by each of them of those exquisite delicacies of professional obligations which elevate so high the importance and dignity of the noble charge with which we, of the bar, are invested. Even, as in one of them, where the most unchained vituperation is but too freely indulged, there is something of those coquettish and brilliant amenities of a flowery and subduing style so peculiar to its author, while in the other, we encounter

the grave and imposing serenity of narration and argument which give such irresistible zest to the vestments in which they are dressed.

Your Honors will have not only perused, but studied thoroughly those two arguments; and such a perusal and study cannot have failed to afford delight to your literary taste and enlightment to your investigations.

This excuses me from dilating at too great a length over many of the issues which they must have forced upon your consideration, although I may have to be indulged in a few remarks, on the occasion of certain touches of romance and poetry, designedly interwoven with the philosophical embroidery which so adroitly conceals, while it beautifully adorns the loose and incoherent texture of the defendants' case. But even in this I shall be most sparing and abstemious.

One of the most important moves of the defendants has been to strive to divert the attention of your Honors from the legal points which so strikingly characterize this case as one of the most interesting events in the annals of our jurisprudence. How sedulously are your Honors admonished, upon the opening of their exordium, not to accept, as too absolute and peremptory, the prescriptions of the Louisiana law, with reference to the points of evidence raised by the present contest, and how nimbly does the writer slide over the hazarded premonition, to entertain and amuse you with the most moving and dramatic portraiture of John McDonogh, drawn mostly from the ante-mortem eulogy of himself which he so complacently had inserted in his original testament.

I would ask your Honors what all this can mean ?  " Is the notion erroneous," as asserted in the defendants' brief, " that the testimony to the testator's handwriting by two credible persons, who had often seen him write and sign his name, is sufficient to establish his will, without regard to opposing circumstances and proof ?"

To this we answer, that we have not yet intimated that the testimony of two witnesses swearing to the genuineness of the testator's writing and signature, would repel contradictory circumstances and proof, but we meant to assert, as we maintain now, that the evidence of two credible witnesses, who had seen the testator write and sign his name, in his lifetime, and who swore that the writing and signature offered to them for examination were genuine, constituted a complete proof which the law recognized, and which would stand until contradictory proof of equal dignity, strength and character had, not opposed only, but subverted it; and this I shall presently establish by an imposing array of authorities and judgments which will place the question above all possibility of dispute.

The text of the codicil, on which rests the title of the claimant, is to be found in the record, and in the briefs filed. The original document itself is now before your Honors. In point of form it is an olographic will, and that is undisputed. Then the first question which suggests itself

is, how it ought to be probated ?   Quid probandum !

The law points out three modes of proof :

1. The testimony of witnesses swearing that they saw the testator date, write and sign the instrument; and this would doubtless be the best of all possible proof.

2. The declarations of two credible witnesses swearing, that they recognize the handwriting of the instrument, as being entirely of the testator, date, body of the writing, signature and all, they having seen him write and sign his name often in his lifetime.

And, 3. The comparison of writing by experts.

Now, it is well known that in ninety-nine cases out of one hundred, of olographic testaments, the first of these proofs is rendered impossible by the mystery in which they are universally involved; and laying aside the declaration of John McDonogh to Cass, when he deposited with him his codicil in favor of Fox, we had no other proof to produce of its genuineness than the testimony of the second and third class of evidence; but this we have produced, complete, peremptory, absolute.

Yet our opponents are not willing to surrender the point, and under the consciousness of their impotence to minister any sort of evidence capable of subverting ours, based as it is on the foundation laid down by the law itself, for the ascertainment of truth, they seek to escape the imperative requirement by a reference to a case quoted from the Journal du Palais, vol. 68, p. 1172.   It is the case of *Quatrefages* v. *Malian.*

I will now show your Honors the incorrectness of the view taken of that case by my learned and honored friend, Mr. Roselius, following the steps of Mr. Hunt.

The law of France is exactly like ours, in point of principle.   In its application, however, it differs, in some respects, from ours.   In France, the Court of Cassation, the last and only resort for the final determination of disputed questions of law, has no control whatever over the facts of a case.   They are excluded from its jurisdiction, and remain untouched, even when they are so intermixed with the law as to form a constituent element of the question to be settled, in which case the facts are almost invariably subjected to further investigation before the Imperial tribunals or tribunals of appeal, to which they belong exclusively.

And the Court of Cassation never attempts otherwise to qualify the judgments rendered by the courts of appeal than by the declaration that they have not violated the law, though but too often they may have violated truth in their appreciation of facts.

In the case of Quatrefages, the question was exactly where it might have been in Louisiana, so far as it remained in the courts of inferior jurisdiction.   The legatee presented for probation an olographic testament, coupled with various documents alleged to be of the testator, which were offered as evidences of the genuineness of the will.   The judge refused to admit the will, though the legatee offered to have it expertized

by competent witnesses. The refusal was based upon the fact that both the testament and accompanying documents were objected to, by the legal heirs, as being fraudulent and forged. This refusal, on the part of the judge, had nothing irrevocable in it; it was but a decree à limine, which committed no interest irreparably. The sending in possession which would have followed the probation, might have endangered the succession, whilst the latter could not have suffered from remaining, for a time, in suspense, under the guardianship of the executive judicial authorities. The legatee appealed. The Imperial Court of Colmar, to which the appeal went, confirmed the provisional decree of the inferior tribunal, and the case having gone up to the Court of Cassation, the latter dismissed the appeal, declaring that she saw no violation of the law in the judgment complained of.

The same thing might have occurred under our jurisprudence. Suppose a testament had been brought into our Court of Probates, under similar circumstances, coupled with papers bearing marks of forgery or denounced as such by the legal heirs; would our judges have felt justified in probating it, when, by some little delay, and until the question of the verity or non-verity of the documents had been subjected to a contradictory discussion, and been decided, no harm could be done either to the legatee or to the succession ? The Quatrefage case presents no sort of anomaly between its incidents and those of the present one, except in the exclusion from the jurisdiction of the Court of Cassation of all control over the facts, which does not exist in our laws with reference to the Supreme Court. The principles applicable to a case like ours are nearly identical, and there is not the slightest diversity of sentiment in what concerns the manner of proof, between the French commentators and the Louisiana jurists.

I come now to the eulogy which prefaces the argument in defendants' brief : It is truly an admirable specimen of that elasticity of spirit, of that abundance of ingenuity and resources, in a word, of the singular adaptability of its author's intellect to all the requirements and exigencies of a difficult and intricate case.

We are told in it " of the beloved father of the testator who would take his sons and daughters by the hands, and lead them nightly to a singing school, staying with them and taking a part in their singing and exercises; and of the love for singing and sacred music which this gave John Mc-Donogh, in youth, and which aided him, under the Most High, to what little virtue he ever practiced."

And also of Mr. McDonogh's mind " steadily fixed upon the acquisition of a large fortune, not for the purpose of present enjoyment, but for a great and noble end."

And of " his being harsh and unfeeling towards his debtors, and of his rigidly exacting his legal rights, without regard to their condition or

their appeal to indulgence, while he considered every lawsuit against him an attempt to diminish a sacred fund."

And of "his regarding himself in his prosperity and wealth as the distinguished favorite of the Divinity, giving himself to an imagined inspiration from above, and styling himself the steward of the Lord."

In God's name, what bearing has all this on the case which your Honors have to decide ? And yet, it is when our opponents delineate, with such pointed accuracy, the eccentric conceits and the maniac aspirations of their hero, that they invoke his steadiness of purpose, his pertinacity of designs, excluding from his thought and imaginings anything but the dreams with which is filled his imperishable testament.

How pretending the assumption, and how little accordant with what we all know of the versatility of our nature and of the unsteadiness of our purposes and designs !

Is it asked that because the codicil to Fox is not in strict accordance with the views and tendencies of mind manifested in the testator's first will, it be rejected, the alleged anomaly being suggestive of suspicion and distrust ?

Why, have we not the emphatic denial of that alleged sensibility of the testator concerning the disposition of his estate and limiting his liberalities, even when directed towards his own nearer relatives, to a nominal amount, of a few hundred dollars at most, in the legacy which he made to Pena, of one hundred thousand dollars, and in those which some of his friends so confidingly expected for themselves? Yet, not so many years had elapsed between the date of the codicil to Pena and the date of the original testament, as between the latter and the codicil to Fox. And who can pretend to judge of the incongruous vaccillations which, in less than one second's time, will start up and domineer over the best ordered and settled mind ? Why, sirs, we see sometimes a dying man, almost in actual agony, surrounded by friends and by near relatives, and attended by the tender wife who shared in all his troubles and trials, upheld him in adversity, and still watches at his pillow to assuage the asperities and dispel the terrors of approaching dissolution, and when he is gone he is found to have disposed of everything he possessed in favor of some capricious and transitory but privileged affection. Case of Meunier.

It is not true, then, that Mr. McDonogh had such an invincible antipathy to leave any liberality to any private individual, his family not excepted, that might exceed a few hundred dollars.

And with reference to the apparent antagonism between the sentiments expressed in his original testament, and those which may have prompted the liberalities to Pena and Fox, who will contend that, as they took place a very short time before his death, they did not proceed from some remorse started up in his breast by the consciousness of the distress and misery in which he had left his family, while he was living a long life,

possessed of a nabob's fortune, foolishly devoted to the prosecution and future accomplishment of the wild schemes which were so soon to end in the desolating nothingness which we are witnessing around his deserted grave !

And shall I, compulsing the annals of the past, ferret out, for your Honors' entertainment, the eccentricities and extravagances which, in all times, have been recorded in the most solemn testaments, to the shame and humiliation of human nature ?

Diogenes directed his heir, by his testament, to cast his remnants to the winds and scatter them over the wild fields, requesting only to be provided with a stick to expel the vultures.

An eminent and wealthy Thebean lady imposed upon her legatee the obligation of carrying on his naked shoulders her dead body to the grave.

One of the great celebrities of Greece ordered that he should be followed to the grave by twenty-four beggars, dressed in his own clothes, who should be neither crooked, nor blind, nor one-eyed, nor crippled, nor scabby, but of handsome form and size.

And another who used to take delight in the constant thought of death, which frightens so many others, left seventeen testaments, remaining convinced that he had made good provision for everything. But each of his wills, which had to be bound in a volume, to facilitate reference, became the occasion of most numerous, intricate and interminable conflicts.

Troplong, from whom I have borrowed these strange examples, says, after alluding to them: "I might indefinitely multiply the cases of eccentric and fantastical testaments. But, since the testament is the testator in person, why should we require him to be constantly in his good sense and judgment, when we know that he is so often wanting in both."

In the case of Meunier's son-in-law, of his legal heirs, and of his widowed wife against Layraud, who claimed the succession under a universal legacy, two testaments were brought in conflict, both made by the deceased, at the distance of from five to six months from each other. The second, which was the one sought to be enforced, was written upon two leaves of common paper, entirely disjoined, and apparently separated by a suspensive comma, at the foot of the larger leaf on which was written the legacy, from the other leaf, about one-half smaller than the first, on which were written the following words:

"These are my last dispositions and repeal all others I may have made anterior to this date."

Neris 22d of July 1838. Signed, Meunier.

The testament anterior to this, which bore the date of the 11th of February of the same year, had been written by the testator, not on rags, as the other, but upon a stamped double leaf of paper, with minuteness,

34

care and attention, and contained a repetition, by reference to the margin, of a single word which had been overcharged in the body of the writing acknowledged and approved by the writer. The last will, on the contrary, had many surcharges in the main body of the writing which were neither referred to nor approved; and, besides, it was in a condition which seemed to attest the light value which the testator attached to its contents, the same being rolled up in the form of a bottle cork, and bearing the appearance of a cast-off paper; and the disparity between this mode [of testing, by which a stranger was made the heir, and the mode he had pursued in the first testament, by which his wife and his son-in-law were instituted his legatees, was being urged with great force and earnestness against the validity of the last. Yet these circumstances, and others still more grave, which had intervened between the two wills, were not deemed sufficient to overthrow that which had the fresher date and repealed the older one.

A powerful lever is next brought to work against the verity of the codicil, I mean the testimony of Nathaniel Cass, against which defendants allege certain contradictions and discrepancies which would go to destroy the credibility of the witness, and render his declarations under oath utterly worthless.

The imputation fails for want of substance, and, in my opinion, betrays the weakness of defendants' case. The whole rests on matters of minor importance, which cannot have the slightest bearing upon the points at issue. The witness was first examined before Magistrate Saucier, Justice of the Peace, on the 4th of April, 1860, upwards of nine months before his appearance in the Second District Court, which took place on the 16th of January, 1861. His residence was known to our opponents. They had in their power all the means of procuring an investigation of his reputation for good or bad character, and for veracity, in the State and county where he had long resided and was still residing. Why no attempt was made to impeach his morality, remains unexplained, unless the entire reliance of the defendants was based upon their being able to overthrow his evidence by showing some few inadvertences which had crept into it.

There is neither hesitation nor obscurity in his statement of the remittance in his hands, by McDonogh, of the codicil, in favor of Fox, nor of its delivery to the latter. But it is urged, that there is patent contradiction in the fixing of the time of the remittance by McDonogh to witness, resulting from the statement which he would have made in his deposition of April, 1860, amounting to this:

"The fifteen years which intervened since the fall of 1836, I spent on the farm, in Clark county, Indiana, and in the apothecary shop, except a visit to Henrysville. I did not go anywhere else to do any business." And this is urged as a damning proof that therefore, he could not have received the codicil, in New Orleans, in 1849! How easily is our judg-

ment perverted, when we determine to search and find out some circumstance that may cast a cloud over the witness whose character we wish to destroy! Does it not appear to you that when he speaks of his residence of fifteen years in Clark county, and with Ferguson, the apothecary, he means the place of his usual, not continuous residence—of his habitation, of his home? And will you have the irrefutable proof of the intended meaning of his statement? Well, when, a few seconds after making it, he is questioned by Mr. Roselius, in these words: "You have just sworn, that from the fall of 1836, when you left New Orleans, up to 1853, you lived exclusively either on a farm in Clark county, Indiana, or in a store at the same place, with the exception of a trip to Henrysville, where you bought property. How can you reconcile this statement with those already made, when you stated that you had received in New Orleans Mr. McDonogh's codicil in 1849?" The witness remarks, not without some rustic frankness, but with complete self-reliance: "I have told you half a dozen times that I was on a flatboat trading in produce.".... "You misunderstand me about being exclusively in Clark county." Your Honors will not fail to be struck with the pert and ready explanation of the rough and unlettered witness. He does not hesitate. He had clearly put certain restrictions in his language, and they had been omitted. Your Honors know with what levity and unguardedness inferior magistrates take testimony, subjecting, not uncommonly, witnesses to the imputation of unfairness, and sometimes, by the addition or suppression of certain words, betraying them unconsciously into what may seem to be a patent contradiction, or at least an incorrectness in their evidence.

Did not Cass, by a prompt and abrupt reply, manifest the sincerity of his evidence, and show that he felt conscious of having not been done justice in his examination by the Judge?

He must have supposed that his protestation had remedied the incongruity, and would serve as a corrective; and, besides, he was in a state of health which would plead for an excuse if he had committed any grave error. But, it may be asked, why he did not procure this statement to be corrected when the testimony was read to him? Here is what he says in reference to this, on the 17th of January, when he comes before the Second District Court to be examined a second time: "I think the deposition was read to me by the magistrate, but I was so sick that I could hardly hold my head up. I complained to Fox that I was not able to go. I had the chills and fever at that time every day." And at another place of the same testimony, Cass declares that "at the time he gave his deposition, last Spring (1860), he had taken a large dose of morphine, and labored under diarrhea."

Let, then, your Honors absolve Cass's testimony from the imputations directed against it, and recognize, in its bold and characteristic language, the unaffected utterances of a sincere and truthful witness.

Even admitting, for argument's sake, that Cass had exhibited any disposition to deceive the Court by saying untruths, how could this untruthfulness affect materially the cause of Fox? Although produced by Fox, he can hardly be called Fox's witness. By the mere force of circumstances, none of which were under the control of Fox, Cass was the only witness who could give evidence of McDonogh's remittance to him, and of his own delivery to Cass of the disputed codicil. He was the only possible, the inevitable witness of the case. That the view which I am now taking of Cass's testimony is not an idle assumption, on my part, your Honors will discover by recurring to vol. 1, p. 589, of Greanleaf's Essay on Evidence, where it is said that "When a witness is not one of the party's own selection, but one whom the law obliges him to call, such as the subscribing witness to a deed or will, or the like, he can hardly be considered as the witness of the party calling him." It cannot be said that Cass is the witness of Fox; having been made the trustee of the will, he alone could deliver it.

In whatever way the delivery may have been made, and under what circumstances soever, from the moment that not a particle of proof is exhibited of any improper connivance having existed between him and Fox, the delivery was good, and Fox cannot be made responsible for any mystery in which it may have suited the fancy of the witness to involve the execution of his trust.

"Though papers, says the author, and other subjects of evidence, have been illegally taken from the possession of the party against whom they are offered, or otherwise unlawfully obtained, this is no valid objection to their admissibility, if they are pertinent to the issue. The Court will not notice how they were obtained, whether lawfully or unlawfully, nor will it form an issue to determine that question." Greenleaf, vol. 1, p. 368, sec. 224.

The case of Fox can, therefore, in no manner be affected by any discrepancy in Cass's testimony, nor by any error of memory which may have occurred in his deposition. After all, it will not be pretended that either those discrepancies or those errors alter or obscure the question in point, which is, whether or not Cass delivered the codicil to Fox.

Next comes, within the circle of my inquiry, the testimony of General Grivot, and of Maurice Barnett. The deposition of the latter is but a pale and servile copy, or rather an obscure paraphrase of that of General Grivot, at least so far as it goes. They both destroy themselves by the incoherence and incongruity of the motives and reasons which they assign for the opinion which they have expressed of the instrument submitted to their consideration.

If we felt inclined to retaliate against our opponents, in our comments on the testimony of General Grivot, what materials would we not be afforded, to crush him under the anomalies of his statements and of his remembrances concerning the most important facts in the case. Besides

the overwhelming weight of authority and character which the witnesses who have sworn to the genuineness of tha codicil, carry along with them, in the history of the case, they are supported in their judgment of the perfect similitude and identity of the handwriting and signature to the codicil, not only by the declarations and experiments of the most prominent witness for the defendants, Dr. Mercier, but also by the significant though tardy asseveration contained in the' additional brief filed in court by defendents, after the case had been fixed for trial. There is a struggle of no mediocre strangeness between General Grivot, Dr. Mercier, and the counsels for defendants who signed the supplemental brief. General Grivot swears that there is not the slightest resemblance between the handwriting and signature of the codicil, and the handwriting and signa-ture of John McDonogh in documents admitted to be genuine; while Dr. Mercier swears, with equal persistence and earnestness, that the likeness between the two signatures is so much alike, that the signature to the codicil can only have been produced by its being traced upon the lease of McDonogh to Fernandez; and the counsels for defendants come out with a solemn asseveration that the very body of the codicil, till now entirely unassailed, is, like the signature, so similar to the handwriting of McDonogh, that it must also 'have been traced by the hands of a forger.

Your Honors will grant that, either Dr. Mercier is right, and then General Grivot must be wrong; or General Grivot is right, and Dr. Mercier must be wrong. They are both equally eulogised by our adversaries for their intellect, ability and experience; and yet they cannot both be right, nor both be wrong. Which of the two will your Honors take as a guide in the progress of your investigation? If General Grivot, you cast to the winds the entire testimony of Dr. Mercier, and take from the case the only foundation on which stands the structure of the decree we are appealing from. If you decide for Dr. Mercier, what becomes of the testimony of Grivot, Crawcour, and Maurice Barnett?

The defendants remain with no support except that of the Doctor, isolated from all the other witnesses, in the face of the incontestible errors in his appreciations and experiments, signalized by the only two competent experts heard in the case. Mark, then, sirs, what a vast sea of difficulties you must wade through before reaching a point where you may rest your consciences and find a base to build up your convictions against the codicil.

Seven of our witnesses, all gentlemen of unspotted integrity, and possessing the special knowledge and experience of the testator's handwriting and signature, attest, under a solemn oath, the genuineness of the codicil; while, to weaken or defeat their testimony, the defendants are left with the lame and unsupported declarations of General Grivot and Maurice Barnett, flatly contradicted by those of Dr. Mercier.

But this is not the only discrepancy in the testimony of the two wit-

nesses just brought to your Honors' notice.   They both give, as the base
of their opinion, the form  and quality of  the paper, the distance  which
separates  the  lines one from  the  other, in the body of the writing, and
the body of the writing from the signature; these are the reasons assigned
by both  witnesses.   But  General  Grivot  takes to  his exclusive account
other  considerations, of which he  delivers himself  with a  truly amusing
emphasis.   He had enjoyed the  most unbounded confidence from  John
McDonogh, and  could not  be mistaken in the picture which he draws of
his habits and manner when writing or signing a document, and of his in-
vincible repugnance to dispose  of  any part of his estate in  a manner de-
rogatory to the cherished scheme  he had laid in his testament.   General
Grivot had inspired him most especially with a sort of  horror against the
use  of the word " trustee," etc., etc.

Now, sirs, let me ask you if this trash can have anything to do with the
question, the sole question which lies at  the bottom of  this case, viz : is
the codicil on which Fox sues a genuine document, or is it a forgery ?

Has the texture and outer appearance of the paper such a magical influ-
ence that it is to decide the verity or falsity of the codicil ?   And is the
will of  the testator  to be disregarded and overthrown, because, forsooth,
it is not written on satin paper or upon the varnished leaves bathed in the
waters of  Annonai ?

The pretension is so strange 'and extravagant, that it  defies all qualifi-
cation.   And yet it is not the first time in the annals of  justice, that such
trifles have been resorted to in the  hope that they might be used  to ob-
struct, if not to defeat legitimate instruments; but this is  the first time
that a Court of  Justice would  be induced to admit them.

I ask leave again to refer to the case of  Meunier's olographic will, from
which I have already quoted.   Obs. des Trib., vol, 12, New Series.   The
perusing of  it to which I am  about to proceed, from  a translation which
I have carefully made into English, will convince  your Honors  that the
very identical objections were made  in that case  against the  validity of
the testament, which  the defendants  press and urge in  this; it  will en-
lighten your Honors upon the contempt with which the  judicial minds of
France treat such cavils and subtleties.

A Mr. Leyraud, a gentleman  of high  repute, a lawyer  by  profession,
Mayor of the city of Gueret, and a Deputy for the Department of Creuze,
in France, deposited  once  in Court a paper which  he represented as a
testament from one L. Meunier, by which the said Leyraud was instituted
the universal legatee of  the testator.

The alleged  testament consisted of  two fragments of  paper, one being
the half of a leaf of common letter paper, on which was written the
legacy, and the other, but one-half of the preceding one, which read as
follows :

" Such are my last testamentary dispositions, which I hope will be

respected. I annul all testaments which I may have made, under date anterior to this."

At the top of the larger fragments was written the date Neuris, this 22d July, 1838, and the same date in the same figures was repeated at the foot of the second.

The two fragments were tied to each other by means of two waifers, and both presented numerous traces of compression and friction.

According to the assertions of the legatee, things had taken place as follows :

Mr. Meunier being sick at Neris, and having received information that two letters containing his testament had been purloined by his servant, and delivered secretly to his wife, concealed a copy of the will which he had preserved. He put it, says Leyraud, either in his pocket rolled up in the form of a bottle cork, giving it the appearance of a cast-off paper, to avoid betraying its importance, or in the wadding of his nightgown, diminishing as much as practicable its volume, that its existence might be secreted from his wife, who had accompanied him to Neris.

Meunier carried it from Neris to Gueret; and it was seventeen days after writing it, that he placed the document in the hands of Leyraud, and Leyraud was claiming the delivery of the legacy under it.

But the testament was being resisted, and its nullity asserted by Paul Devilher, the son-in-law of the testator, instituted his universal legatee by an interior will bearing date the 11th of February, 1838, who was assailing its validity on the various grounds hereafter set forth by the widow of the testator.

1. That the thirty-four lines offered as the olographic testament of Leonard Meunier, had none of the characters with which ought to be invested the acts exhibited in a Court of Justice, to conciliate the suffrage of the magistrates, and deserve the sanction of the public power.

2. That those thirty-four lines of writing were, in reality, laid down on two rags of common paper, between which there was no material link, and between which all sorts of material links were actually made impossible by the form of the rents which defaced them both.

3. That the first rag, which contained twenty-seven lines of writing, had been detached from a larger leaf of paper, of which it retained a light fragment on the left; that it bore also an irregular rent which extended as far as the interior of the writing; that it had three overcharges left unapproved and unnoticed; that it terminated by a comma, and that all the verso was a blank.

4. That the second rag of paper, containing seven lines, was about one-half smaller in dimension than the first. That in its inferior part, it had been separated without the slightest care from some other leaf of paper, itself separated from a larger leaf, as shown by the numerous and

irregular denticulations around it.

5. That the said two rags of paper had undergone, at all points of their surface, a bruising, which had left an impress which was unalterable.

6. That the material condition of the two rags repelled the idea of a settled testament. That at best it might only be conciliated with the thought of a projected but incomplete and abandoned testament.

7. And that the appreciation made of the said two rags, which was fully justified by the teachings of daily experience, was confirmed by the contrast between them and the testament of the 11th of February, written on a leaf of stamped paper, with minutious care, repeating in a reference signed by the testator, a surcharged word, the only one surcharged in the whole instrument.

And it was urged by the counsel of the opponent, "that the document was rumpled, and would not be considered as serious, because, when we dispose for posterity, we use our holiday writing !"

To which the defender of the incriminated will would answer, "that the bruising, the stains upon the instrument, could not prevent it to be good and valid; and that such was the doctrine of Touillier and Duranton. The doctrine was : that when an olographic will was invested with all the formalities prescribed by law, it would stand in all the weight of its intrinsic strength, until it were proved that it had no validity as a will, or that it was an impudent forgery.

Such had been the repeated warnings of General Grivot to his client, as he tells us, respecting the title which he should give to those who might be entrusted with the execution of his will, and with reference especially to the awful danger of using the word trustee, that it amounts to absolute impossibility, that Mr. McDonogh have used that word in any document by which he meant to dispose of anything belonging to him, and the fatal name being in the codicil, the codicil can only be a forgery. But Mr. Grivot has himself furnished us from amongst the twenty odd papers he brought into Court, all in the handwriting of John McDonogh, a document in which the writer attempts in vain to recollect by what name he has designated the executors of his will, so lightly had he been impressed by the admonitions of his confidential counsel. Mr. McDonogh, your Honors will remember was a Marylander by birth, and had been educated in Maryland, where the word trust and trustees are of common parlance, and enter into the most familiar concerns of life, what strangeness then could there have been in his using the appellation of trustees to indicate the administrators of his estate in Louisiana ? Might not this have been another instance showing that he had forgotten the appellation given to them in his will ?

Again, another most significant feature and incident in General Grivot's deposition. I allude to his anxiety for procuring support to his testimony

and for imparting to it an authority which doubtless he felt it did not possess.

Of all men in New Orleans, who had happened to be engaged in business transactions with John McDonogh, none had seen more of his handwritings and signatures than Adolphe Mazureau, who had been for a great number of years one of his notaries. M. Mazureau, from the relations he entertained with him, could not but have acquired the most intimate knowledge of the character and peculiarities of his client's habits and manner of writing and signing his name. M. Mazureau, besides, had been entrusted (here we have again a trustee) with the making of the inventory of Mr. McDonogh's property and papers, a trust, the execution of which must have afforded to him the best of opportunities, which no other witness ever possessed, for correcting by the most intense and close observation whatever erroneous opinion he might have formed of the main characteristics of John McDonogh's writing and signature; and what wonderful and safe control was that with which he was invested by the sacred duties of his profession, of opening, reading, numbering and identifying with his notarial paraph every rag of paper supposed to be of the slightest importance, extracted from the unwieldly mass of manuscripts which filled the spacious boxes in which they had been carefully stored. There is a room still crammed with the vestiges left of that examination and review. Whence could M. Mazureau have derived more sure and instructive teachings than from those long and patient consideration and study of the written trash in which had spent themselves the intellectual labors and elucubrations of the most eccentric mind that ever was imparted to any human being ?

It was M. Mazureau whom General Grivot undertook to commit, by imprudently anticipating the testimony which he supposed he would give in the case, intermixing his own evidence with a certain conversation which he would have had with him on coming to Court some days before. M. Mazureau denied that he had held the language imputed to him by General Grivot, and the flagrant error and misrepresentation in General Grivot's testimony has not, that I know, been accounted for to this day.

"I deny peremptorily that I said anything of the kind to Mr. Maurice Grivot; I state exactly the reverse." And further, M. Mazureau asserted again with an expression of indignant rebuke, that "Mr. Grivot had made him declare exactly the reverse of what he had said; that Mr. Grivot expressed himself against the document, whilst he (Mazureau) stated that he had examined it, and found it looked like the handwriting and signature of John McDonogh."

May it not seem strange, nay exceedingly harsh, on the part of the defendants, that they should have shown themselves so inexorable and so unsparing in their bitter criticisms of Cass's testimony, when that of

one of their most prominent witnesses was sweating with irreconcilable errors and contradictions.

If errors of statement, misconception of facts, and misrepresentation of that which it would seem ought to be most familiar and most present to the memory of a witness, are to be taken as an evidence of his perversity and falsehood, what would the position be which General Grivot would occupy before your Honors, if you had to judge him by the dire rule so unrelentingly applied to the testimony of Cass ?

Never did Cass place himself, in any part of his deposition, in the ungracious and unenviable predicament in which General Grivot, whom I accuse but of an excess of zeal, is placed by the most salient points of his testimony ? Now to the proof:

Mr. Grivot swears that there is not the slightest resemblance between Mr. McDonogh's genuine handwriting and signature and the handwriting and signature of the codicil; and not only seven unassailable witnesses of those produced by the claimant swear quite the reverse, but his assertion is in open antagonism with the declarations and experiments of Dr. Mercier, and with the asseveration made by counsel for defendants in their supplementary brief, that the body of the writing is also so similar to the handwriting of John McDonogh that it cannot be but the work of a forger, by the process of tracing.

General Grivot swears that no document of any importance, that ever emanated from the hand of John McDonogh, was signed by him without the signature bearing two dots under the c in "Mc;" and not only have we established by authentic documents of undisputed character and authority, exhibiting McDonogh's signature in important transactions, without dots under the c in "Mc," but out of seventeen documents introduced in court, by General Grivot, which bear the signature of Mr. McDonogh, and are all of equal importance, twelve of the signatures have dots, and five have none. Two receipts, for a petty rent of twelve dollars each, have the dots under the c, while two other receipts, one for forty-five dollars and the other for twenty dollars, have none. There are, likewise, three letters from Mr. McDonogh to General Grivot, which, in the sarcastic but appropriate language of my colleague, can hardly be considered as unimportant, are without dots under the c in the signature.

General Grivot swears that his client had been most earnestly admonished of the grave danger of using in any document executed in Louisiana, the word "trustee;" and he produces himself a paper in which Mr. McDonogh declares that he cannot recollect by what name he called the administrators of his estate, in his testament.

General Grivot swears that Mr. McDonogh never wrote any paper where the date was so remote from the body of the writing as it is in the codicil, and we present your Honors with the letter of McDonogh to Cazanovo, showing quite the contrary.

And lastly, Mr. Mazureau denies in unmeasured terms the acknowledg-

ments attributed to him by General Grivot, to give countenance and support to his testimony.

Sirs, I am unwilling to cast on the reputation and veracity of General Grivot any suspicion of his having knowingly said anything untrue, but there is the record, perspiring with discrepancies and contradictions; and whilst I absolve him of all wicked intentions, there stand, nevertheless, his declarations, with the endorsement of the learned counsels of the defendants, who claim that they are all truthful and worthy to be fully sustained.

There is another point in the defendants' argument which requires a passing notice. I allude to the testimony of the banditti who were introduced in the Court below, to assail the character of Fox with the imputation that he had been trying to tamper with them, for the purpose of obtaining a confirmatory proof of his relationship with John McDonogh.

Is the man charged with having concocted so skilful a forgery, as that charged against Fox, to be supposed so much of a fool and idiot as to seek among such rabble a proof of that description, when he had in his possession the best title he could produce to his relationship ? What influence could have exerted the testimony of these robbers upon the question of the existence or non-existence of any relationship with Mr. McDonogh ?

If the genuineness of the codicil were not proved, no evidence from elsewhere could protect him against defeat, and if it was proved, what need had he of any better title than that contained in the deed itself ?

All absurd ! All incredible !

Yet we lend our ears to the echoes of these calumnies, and we allow such robbers to speak in a court of justice ! Do not your Honors see the significancy of the standard on the lead of which they approach the sacred sanctuary in a compact group, aided by that strumpet and public prostitute, Annie Lydia Cochran—the life and soul of that infamous conspiracy! Adultera, ergo vinefica ?

Well might exclaim one of the most illustrious historians of Rome : Neque femina, amissa padictia alia abnuerit ! as if she had pledged to crime when she first began to sacrifice to it what she had of most precious.

Now let me ask what stain has been fixed upon Fox's name, beyond that which defendants would have you to infer from the ridiculous stories invented by these nefarious condottiers and perjurers !

Humble, poor and hard-working, do you find Fox associating with the infernal tribe ? No; he is not of them, nor did he ever share in their infamous revels, though the paucity of his resources may have compelled him once to seek a retreat under the same roof; but he has never communed with them, nor has he been seen huddled in their midst at those places where justice institutes inquiries after perpetrated crimes.

The best evidence of the irreconcilability of his nature with the habits and customs of that gang of cut-throats, is evidenced by the conspiracy which brought them into Court to howl against him the most atrocious

and incredible imputations, in the hope of accrediting them by their congregated perjuries.

Your Honors have the records of our criminal Courts and of the proceedings before Recorders, branding them as thieves and robbers, besides the testimony of ten unimpeached witnesses, who swear that none of them deserve to be believed under oath. Away, then, with such elements of evidence. They would prostrate even a good cause, and can never serve the interests of law and justice. I have done with them.

There is a witness on the side of the defendants, on whose testimony I do not intend to expatiate at any length. Your Honors will, I hope, do justice to a deep sense of tender delicacy, which prevents me from touching with a heavy hand, to so sensitive a subject as that upon which was so boldly exercised the ingenuity of the Doctor. The task of commenting upon it has been fully accomplished by my colleague, Mr. Filleul. Contented with expressing my regret that such an evidence ever came to this record, I shall leave its merits to the dispensation of your judgment, trusting that you will pass it through a strict criticism, and appreciate its importance with proper regard to the sedate, calm and so admirably balanced investigation of Messrs. Manouvrier and George Soulé. Your Honors' attention is earnestly requested to their views concerning Dr. Mercier's experiments; and if, while proceeding on your labors in the study of the case, you come to ask yourselves by what standard of ability and talent you should measure their opinions and judgments, allow me to commend especially to your memory the trial to which the skill of George Soulé was exceptionally submitted, and the glorious triumph with which he came out of it.

As the custom was in other times to introduce an interlude in theatrical performances, our opponents have not been able to resist the temptation of gratifying us, on this occasion, with a ludicrous and most painful hors d'œuvre. I mean to speak of the semi-appearance of Judge Cotton as a witness to give evidence upon questions connected with the verity of the codicil.

Mr. Cotton, at the incipiency of this suit, had been the leading counsel of Mr. Fox, but had withdrawn from the case for reasons best known to him, but which it cannot suit us to discuss in this argument. He was called to the stand, and forth he came without, at first, showing the slightest hesitation. He took his oath, and suffered himself to be interrogated by our opponents. Deplorable forgetfulness! Methought that the very roof of the prætorium was going to fall upon his broad shoulders and crush him to the ground; and with great agony of mind, under emotions which I strove in vain to suppress, I stood all dismayed, trembling lest so gifted a member of the profession should unconsciously assent to make revelation of secrets which he had obtained from his client. The counsels for defendants were affecting great anxiety to hear him speak; and while he was exhibiting some uncertainty and indecision, we were

asked by our adversaries with a studied manner, which savored of ridicule, if we would consent to let Judge Cotton deliver his testimony. Your Honors will judge how far it was respectful in our opponents to ask if we would take, as good evidence against us, the testimony of one who could not depose in the case without violating the most sacred duties and pledges of his profession. We denied our consent that we might not expose the profession to be disgraced, and the inconsiderate counsel to be driven to ruin by an uncontrollable zeal. Fie with the case which needs such appliances to save itself from utter defeat and disaster.

The French annals of jurisprudence commend to our meditations one of those grave and instructive cases which should ever be held up as an example and lesson to such as, forgetful of the solemn obligations which professional dignity and honor impose, with reference to revelation obtained from their clients, may be tempted to prostitute their sacred ministry and to pull down with their unholy hands the mystic wall behind which those secrets should be buried and entombed.

It is the case of Mr. Berrier, the father to the statesman and jurist of the same name, who even now, in his advanced age, retains that freshness and wisdom of mind, that elevation of thought, that supremacy of talent which place him far ahead of the most renowned intellects of Europe.

Mr. Berrier, the father, was, in his own days, one of the most eminent and admired barristers of France, and enjoyed the confidence and respect of the community in which he lived, as well as that of his colleagues at the bar and of the judges upon the bench. He was once approached by two parties engaged in a vast commercial operation, upon ostensible terms which had been stipulated for the promotion of their undertaking, but with a private and mysterious agreement which was to remain a secret until a certain contingency therein expressed should occur. This agreement, after being communicated to Mr. Berrier, had been sealed and deposited in his hands, with a pledge on his part that he should be the discreet guardian of their private concerns and keep them from the knowledge of the world, so long as the condition on which alone they could be revealed should not be completely fulfilled.

The parties soon came to difficulties, and one of them anxious to bring to light, and to force to a solution a connection which it no longer suited his interests to keep in the dark, went to Mr. Berrier and asked of him a surrender of the agreement confided to his trust. Mr. Berrier could not be induced thus to break his pledge, and invoked the inhibitions imposed on him by the rules of his profession. The discontented party went off, and immediately brought a suit in damages against Mr. Berrier. Mr. Berrier appeared in person. The Judge ordered him to produce the agreement, remarking that the order relieved him from all responsibility, but the stern and unbending counsellor persisted in his denial of compliance, and was condemned to pay in the form of damages the enormous sum of twenty-five thousand francs. No sooner was this decree rendered

than Mr. Berrier appealed. . But when the case was called up in the Court of Appeals, and Mr. Berrier rose to address the Judges ; 'stop,' said to him the President, with marked solemnity; "you need not open your lips in defence of your fidelity to the sacredness of the obligations you owe to your clients as a barrister and counsellor, bound by all the laws of honor and of professional dignity, not only not to whisper but even not to intimate by a motion of the muscles, or by a reticence of the tongue, anything from which would be inferred the remotest suspicion of treachery to the confidence reposed in you. Resume your seat at the bar; you stand discharged."

And I am also reminded, on the occasion of this case, of an anecdote which if I am not mistaken, I read in my younger days, in Aulugelli Noctes Atticæ, with reference to an attempt made to produce before the pretor a certain witness named Lentulus, who was to give evidence in a suit in which his master was deeply interested. Lentulus was a most profound hypocrite, and exceedingly dexterous in the execution of the most dastardly schemes. Having been tampered with by his master's enemies, he had come to the pretorium to accomplish his nefarious task. He assumed a sad and morose countenance, approached the pretor with a slow pace, and presently came to his presence with his head bent to the knees; he began to mourn, and to sigh and to shed tears, deploring that he had to bear testimony against his good master. The pretor, displeased with the affected manifestation of sympathy, and believing that he discovered on what errand the witness had come to the pretorium, took him roughly by the shoulder, and thrusting him out, away, said he, away, you histrion.

And now that I have gone through this long chapter of calumnies, contradictions and legal trickeries with which the defendants have striven to extinguish the right of the claimant, I will cast a rapid glance over the general aspect of the case, and enquire with confidence from your Honors on what side stands truth and justice. The testimony of the seven witnesses, who have sworn to the genuineness of the codicil, remains entirely unassailed. It is conclusive.

The dissenting declarations of General Grivot and of Maurice Barnett are utterly upset, not only by the seven witnesses produced by the plaintiff, but also by the documents introduced by Grivot in support of them, and by the repeated and contradictory asseverations of Dr. Mercier, whose experiments against the verity of the instrument, are the defendants' forlorn plank of hope for the success of their case.

Conjectures and mere suspicions, vague and incongruous, proceeding from the scandalous divagations of banded criminals, the utopy of the forgery by means of tracing, brought into the contest as a last screw to prop up the decayed structure of the defence. Such are the elements of proof, the presumptions, the circumstances, the adminicules by which our opponents expect to subvert the strongly cemented edifice erected by

us on the foundation laid down by the law itself, as the only base from which truth should be considered and made predominant.

"The olographic will," as we are taught by our Code, Article 1581, "is that which is written by the testator himself. In order to be valid, it must be written, dated and signed by the hand of the testator. It is subject to no other form."

And we read in the Napoleon Code, Article 970 : "Le testament olographe ne sera point valable, s'il n'est écrit en entier, daté et signé de la main du testateur. Il n'est assujéti à aucune autre forme."

Thus the principle at the bottom of which lies, in the French as well as the Louisiana Code, the right and the manner of testating by olographic will, is strictly identical.

But our law points out in clear and indisputable language, how the proof that the will is entirely written, dated and signed by the testator is to be established, and the Civil Code at Article 1648, provides that "the olographic testament must be acknowledged and proved by the declarations of two credible persons, who must attest that they recognize the testament as being entirely written, dated and signed in the testator's handwriting, as having often seen him write and sign during his lifetime."

When counsels seek to weaken the mandates of the law, by reducing a complete compliance with its behests to the grade of a vulgar presumption, they but misconstrue both its letter and spirit; the letter, for the words of command which make the proof complete are absolute and peremptory; and the spirit, for allowance of the special form of evidence required, is predicated on the favor granted to the olographic will, and on the necessity of protecting the secret designs and purposes of the testator against the obsequious and impertinent inquisitions of turbulent and aspiring heirs.

At the same time, therefore, that our law lays down the principle of existence of the olographic will, it also defends it against the hostility of those who may have been disappointed in their hopes or rebuked in their aspirations.

Great stress is applied to the assertion that the proof of the genuineness of the incriminated document is but of a secondary character, and that although made in conformity with the requisites of the law, it is nevertheless no more than a mere conjecture and presumption.

It was not so considered by the wise and profound jurist, who presided over this Court for such a length of time, and with such distinction when ho was proclaiming in the case of                          that even "a mere belief resulting from the inspection of the handwriting of a person whom we had seen often writing, or whose letters we had received, was prima facie evidence, strong presumption, and stabit presumptio, donec contrarium probetur.

"A legal presumption," says Merlin's Rep., vol. 24, p. 407, "dispenses

the party in whose favor it militates, with the proof of the fact on which it relies, either as plaintiff or as defendant;" and at page 464 of the same volume, he maintains that, "in civil matters the depositions of two unimpeachable witnesses is regarded as the just foundation of a complete proof."

And mark, sirs, that such a proof in a case of olographic will, is the best and most complete of all.

There are but three degrees of proof:

1. That ministered by witnesses who were present at the making of the deed, and saw the author write and sign it.

2. That which is produced by witnesses declaring that they recognize the handwriting and signature of the instrument submitted to their consideration, as genuine and true, they having seen the author of the same write and sign his name often in his lifetime.

3. The comparison of writings by experts.

It cannot be doubted that in ninety-nine cases out of one hundred, an olographic testament is a work performed in solitude and secrecy, to the execution of which it is hardly natural that any human witness be invited to assist. If so, the plaintiff has complied fully with the only exigencies which were imposed upon him by the circumstances of the case. The testimony of Manouvrier and George Soulé, two most talented chirographers, establishes the genuineness of the codicil, "because its whole body was written freely, whereas, if it had been traced, there would be more stiffness in the writing."

And George Soulé, being specially asked to give his opinion as to whether the handwriting and signature of the codicil are natural and genuine, or foreign or imitated, declares that he considers the document a free and natural handwriting, and that he sees nothing in it to lead him to believe otherwise.

It should also be remembered that Art. 325 of the Code of Practice assigns the same rank and importance to the testimony of the witnesses, who only testify from their acquaintance with the handwriting of the writer, acquired by the habit of seeing him write and sign his name, as to that elicited from such witnesses as swear to have seen the author write and sign with his own hand the instrument submitted to their inspection.

I shall now proceed to place before your Honors the rules prescribed by the best accredited jurists, to ascertain what ought to be the weight and value of the presumptions and doubts, and conjectures raised by those who oppose and seek to defeat a document sustained by complete proof and secured by the most competent experts and witnesses, to be beyond the reach of all suspicions of adulteration or forgery.

The universally admitted principle is, that " in all cases the presumption is always in favor of the act." Marcadé, vol. 4, p. 12, sec. 18.

And Portalis, in the Exposé des Motifs, maintains the doctrine that

"the presumption in favor of the validity of the act, does not cease until the act is annulled."

"Proof, says Merlin, considered with reference to the various degrees of certitude of which it is susceptible, is commonly divided into complete proof, semi-proof, and light proof. The proof is complete when it creates an entire conviction in the mind of the Judge; the semi-proof is that which creates a considerable presumption, but from which does not result a perfect conviction; the light proof is that which has no other foundation than conjectures, mere adminicules.

"Is that distinction between the complete proof, the semi-proof and the light proof to be admitted by the law, or by reason? By neither. No traces of it can be found in the texts of the Roman Law, nor in the Novels. The ancient interpreters, who invented it, should have discovered that there was no more of semi-proofs than of semi-truths. Veritas est indivisa, et quod non est plené verum, non est semi-plené verum, sed plené falsum. Merlin, vol. 24, p. 466.

Cujas, commenting on the title universis de testibus, employs the following language: "Ut veritas, sic probatio scindi non potest;—quæ non est plena veritas, est plena falsitas; quæ non est plena probatio, plené nulla probatio est."

Mr. Hunt, in his argument, p. 31, admits that the proofs made by defendants are but rills that trickle from the mountains, slender filaments of hemp which a child's hand could break, etc., etc.

Merlin, referring to these phantoms of proof, quotes the following passage of a most remarkable treatise upon the same subject by an anonymous writer: "It is as impossible that there be semi-proofs, as it is impossible that there be semi-men. The nature of proof is indivisible. That which unveils truth, is proof; that which but half unveils it, is not proof. Since it does not show the proof, it only leads to guess at it."

I well know that it will be said that there are cases where the entire proof cannot be clearly seen, but where it may be seen as under an envelope ; and that, as astronomers possess certain instruments with which, though they do not exhibit clear to our eyes, yet they carry our thoughts and observations to certain things by means of which we acquire some assurance of truth—so there are certain arguments by means of which we do not discover entirely the truth, we at least have a glimpse of it, which enables us to draw probable consequences; so that, though being not a complete proof, yet it is an incomplete proof; yet it is an incomplete knowledge, which may be called a semi-knowledge, and therefore a semi-proof."

To this Merlin replies, after copying the quotation: "Whoever sees something wrapt up in an envelope, sees the envelope, and not the thing itself. In whatever way we may attempt to exhibit truth to our sight, either it is so exhibited that we can recognize with certainty that it is

36

truth, or it comes to us in such a shape that it creates but doubt and distrust. In the first case it is proof; in the second it is simply doubt and distrust. I admit that truth is sometimes stronger and sometimes weaker, and distrust sometimes well and sometimes ill-founded; yet, after all, be the proof stronger or weaker, it is no less a proof; and be the distrust sometimes more and sometimes less just and reasonable, it no less remains a plain distrust. The commentators of old had spoken with more correctness, if they had called mere presumptions, mere adminicules, that which they denominated semi-proofs, light proofs.

Troplong, Droit Civil, vol. 3, pp. 425–426, remarks:

" There are more testaments which are true, than testaments which are false; there are more mistakes committed against writings by chicane, than by the conviction that a forgery was perpetrated. We should prefer the jurisprudence that comes in aid of good faith to that which sides with the snares of procedure and the combinations of an ill-humored nature."

Merlin had said, in vol. 24, p. 464–465, that " In civil matters the depositions of two unimpeachable witnesses is regarded as the just foundation of a complete proof."

And Domat, vol. 2, p. 140, had declared that "In cases where the question arises whether or not a certain fact has been proved, its solution should be determined by the ascertainment of the foundation on which the proof is established, and by the connection of that foundation with the fact to be proved."

Merlin again quotes with approbation from Corvarruvias, who lays it down as an infallible rule for a Judge, "that he never should act upon his own impressions or the impulses of his will, but according to law and right." Bonus judex, nihil ex arbitrio facit, et domesticæ proposto voluntatis, sed juxta leges et juria pronunciat.

Paillet, in his Dictionary of French Law, p. 289, verbo adminicule, expresses himself in the following terms:

" Why has that word a place in judicial language? It is neither proof, nor probability, nor presumption, and has in it more of the conjecture than of a mere indication. It is, therefore, nothing in itself; and yet it aids in making proof, and, notwithstanding that abstract, imperceptible, intangible existence, how often that word, artfully used, has stripped the citizen of his fortune, nay of his very life!" Pailler's Dictionaire du Droit Français, p. 289, verbo adminicule.

" Do you wish to know what has been the consequence of that allowance in furtherance of proof? Ever and everywhere that perfidious doctrine has branded justice and slaughtered innocence." Ibid. p. 290.

Your Honors must now be convinced that the facts and the law of the case are irrevocably with us. Your Honors cannot forego the inexorable conclusion. My remarks must end here; yet I shall not close without asking you to remember the remarkable words addressed by Daguesseau to his colleagues in the Parliament of Paris, in relation to the rule o

conduct which they ought to follow in their judicial investigation: "Judges, said he, never receive the truth, however shining in appearance, except from the hands of the law, and in the form it has established. When the law has spoken, nothing is left us but the glory of obeying."

HOWELL, J.   On the 26th day of September, 1860, the plaintiff, Moses Fox, filed a petition in the Second District Court of New Orleans, and presented for probate the following instrument, to wit :

"Codicil to my last will and testament.

"Be it known that I, John McDonogh, do hereby will and bequeath to my beloved nephew, Moses Fox, the sum of three hundred thousand dollars, which is to be paid to him eight years after my death, by the trustees of my estate, in the city of New Orleans.   Dated New Orleans, November 1st, 1849.

(Signed)                              JOHN McDONOGH."

The plaintiff alleged himself to be the legitimate nephew by blood of John McDonogh, who died on 26th October, 1850, and the identical person named in said codicil, and prayed that the cities of New Orleans and Baltimore, the residuary legatees of said deceased, be notified to be present on a day fixed; that said codicil be admitted to probate, and ordered to be executed; that he be recognized and decreed to be the nephew of said John McDonogh, and as such have judgment in solido against the said cities for the said sum of three hundred thousand dollars, with legal interest from 26th October, 1858, and costs.

The two cities excepted to the proceeding on the ground, that an action for the recovery of the money cannot be merged in an application for the probate of a pretended will, and that, therefore, the order fixing a time for such purpose should be rescinded, and the case placed on the ordinary docket.

And for answer they pleaded the general denial, and charged specially that the paper sued on is a forgery.   The city of Baltimore averring that it is one of a series of forgeries of a similar character perpetrated by a gang of forgers, whose names are unknown to the respondent, many of which have been presented.

On the 15th of January, 1861, the following document was filed, to wit :

" Second District Court of New Orleans.

"Succession of John McDonogh.

"On application of Moses Fox to probate will or codicil, and for judgment for $300,000, etc., under the will or codicil.

"It is agreed by the undersigned that the case be placed on the succession docket of this Court, and tried in its regular order, the exceptions are thereby dismissed, and the case is to be tried on the merits under the pleadings, the question to be determined being the genuineness or forgery

of the paper, which the plaintiff, Moses Fox, alleges to be a will or codicil of John McDonogh.

      (Signed)                      C. ROSELIUS, for Baltimore.

      ,   C. DUFOUR, for Hunt and Dufour, counsel for New Orleans,

      V. F. & J. B. COTTON, R. KING CUTLER, of counsel for Moses Fox."

Under this agreement the parties went to trial, and after a protracted contest and the introduction of a large mass of evidence, the lower Court rejected plaintiff's petition, and rendered final judgment in favor of defendants, from which plaintiff appealed.

The case has been argued in this Court with singular ability, both orally and by briefs; and we conclude from the character of the arguments as well as the terms of the above agreement, that if the instrument sued on is satisfactorily shown to be genuine, judgment must be rendered in favor of plaintiff for the amount of the bequest, and if not, the decree of the lower Court must be affirmed.

To reach a correct conclusion, it is important at the outset to settle the legal principles which apply in such a case, and by which the evidence is to be weighed and the truth, if possible, attained.

The rules of Louisiana law, relating to the opening and proving of wills, apply to the preliminary proceedings necessary to the administration of estates, which are not conclusive upon those instituting them or the parties cited or present; so as to estop them from subsequently contesting the validity of a will, unless at the time of probate its validity was expressly put at issue. 6 A. 104; 2 A. 724; 10 A. 78; C. P. 943.

These proceedings, however, establish a prima facie case, and when attacked the burden is on the party contesting to defeat the presumption of their correctness by sufficient proof. On the other hand, if at the time of probate the genuineness of the will is denied, the party seeking its execution must produce the kind of evidence necessary to counterbalance the express denial, and establish its validity.

The law has fixed the kind and measure of the evidence necessary to the preliminary proof of an olographic will; the testimony of *two credible* persons, who shall have become familiar with the handwriting of the testator by having *seen him often write and sign*; not only sign his name, but write other matter besides his name, and who shall attest, solemnly declare that they recognize the testament as being entirely written, dated and signed in the testator's handwriting; it must be *acknowledged and proved* by them; they must recognize the handwriting of the testator, and declare the whole instrument, date, body and signature to be in his handwriting. C. C. 1648.

All of which must be expressed in such terms as will satisfy the Judge that they entertain no doubt as to the genuineness of the will.

But this rule, the observance of which is essential, does not exclude other and cumulative or corroborating evidence; and, hence, if the

probate of an olographic will be opposed as not genuine in whole or in part, both parties can resort to all the modes of proving or disproving handwriting, and Courts are not prohibited from giving due weight to circumstances, which evidence legally admitted presents.

All evidence of handwriting, except where the witness saw the document written, is presumptive and rests upon the principle of comparison, which is made in two ways : by comparing with the *exemplar* formed in the mind by previous knowledge, or with other writings produced on the occasion, and proven or admitted to be genuine; and at best is merely evidence of opinion, which admits of various degrees, and the weight of which is to be determined by the Court.

Under the common law the proof by comparison with other writings submitted to the witness receives but little favor, and is very much restricted in its use. In this State it is authorized by special enactment, and is adopted in aid or absence of the other mode, except when the latter is essential.

Article 2241, C. C. provides that, "if the party against whom the act under private signature is produced, disavows the signature, or the heirs or other representatives declare that they do not know it, it must be proved by witnesses or comparison, as in other cases." And Art. 325, C. P. provides that, "if the defendant deny the signature or contend that it is counterfeited, the plaintiff must prove the genuineness of such signature, either by witnesses who had seen the defendant sign the act, or who declare that they know it to be his signature, because they have frequently seen him write and sign his name. But the proof by witnesses shall not exclude the proof by experts, or by a comparison of the writing, as established in the Civil Code."

The principle recognized in the application of this rule of law is, that the express denial of a signature to a private writing, or the charge that it is counterfeited has some weight, and imposes upon the party seeking to enforce the obligation, the burden of *counterbalancing* its effect by the kind of evidence prescribed. 9 L. 560-2.

The plaintiff has, in the agreement above recited, and the mode pursued in this proceeding, admitted these principles of law and undertaken to establish the reality, both as to the writing and enunciations of the instrument presented by him as a codicil to the will of John McDonogh, and charged to be a forgery, by evidence as to the handwriting, the circumstances of his possession of it, and his identity as the nephew and legatee of the alleged testator.

He introduced thirteen witnesses to prove the handwriting, five of whom declare that they have often seen the testator write and sign his name, and from their knowledge of his handwriting they express, in different terms, their belief that the document in question is the writing and signature of John McDonogh; three of these had opportunities of seeing him write until the year of his death, 1850, and the other two had

not, since 1839 and 1840. These witnesses are unimpeached, and they testify, with more or less confidence, to the genuineness of the handwriting of this important paper; and it may be said that the apparent want of entire confidence is, under the circumstances, a test of their sincerity; and, *if there were no contest*, their testimony might be considered sufficient; but all the circumstances, immediate and remote, are unquestionably calculated to excite strong suspicions, and cause conscientious persons to speak with diffidence as to the reality of the writing, to establish which, they must themselves evince no doubt.

One of the five witnesses, who professes to have been familiar from childhood with McDonogh's writing, and who examined and inventoried his private papers, expressed a fear, when he first saw the codicil, that it might be a forgery, and all of them, except perhaps one, evidently testify under a consciousness that it is subject to the charge of forgery.

The plaintiff, with a view probably to remove all doubt, introduced a witness as the person charged by the testator with the delivery of this codicil, and by his testimony the case is to be materially affected; for, if true, the genuineness of the document and the identity of the legatee are put at rest; and if not true, an important and necessary link in the chain of proof is wanting, and plaintiff has materially damaged his cause by attempting, but failing, to *complete* his title to so large a fortune. It is very true that he is not responsible for the veracity of the individual who may have been selected by the testator to transmit the title to him; and it is among the possibilities that such individual may be unworthy of credit, and may yet have actually received and delivered it; but he must satisfy the Court that he was so delegated; his testimony must be weighed as that of any other witness, and plaintiff's cause must necessarily be affected favorably or unfavorably by the result of the test to which it is thus subjected. Not that it will discredit reliable witnesses, but that their testimony, not being sufficient in itself, will be unsupported and the proof incomplete.

The District Judge, before whom this witness was examined, did not believe him; and we are constrained to admit that his testimony is of such a character that we cannot say the Judge did him injustice. A careful perusal and analysis of it, under a full sense of its importance to the case, have failed to produce conviction in our minds of its correctness. He has not satisfied us that John McDonogh, an old and wealthy citizen of this parish, entrusted him, a stranger, a non-resident, a transient person, coming here occasionally as a flat-boat trader, with so important a charge. His statements are confused, inconsistent, contradictory, and present facts so improbable that it is a tax upon the most willing credulity to accept them. From his testimony we can gather that, from the fall of 1836 or 1837, when he professes to have made a casual acquaintance with both plaintiff and McDonogh, up to the spring of 1860, when he says he gave the "codicil" to plaintiff, he was in New Orleans only five or six times at

the most, and never remained, at any one time, over two or three weeks, but generally only two or three days; and on no occasion does he seem to have had any interviews with either plaintiff or McDonogh, more than the salutations of transient acquaintances, and nothing is suggested in their respective relations to each other calculated to invite or authorize such a confidence. He does not show that he was the friend of plaintiff, or was in such position as to be a probable channel of communication between the two; on the contrary his whole history repels any such idea.

His account of the time and manner of receiving, keeping and delivering the "codicil," instead of commanding belief, creates distrust; and the history which he gives of his residences, employments, movements, acquaintances, etc., makes it difficult to know anything about him. He seems to have a definite knowledge of only two periods—November, 1849, the date of the "codicil," and March, 1860, when, as he says, he delivered it to plaintiff. He gives different statements of the length of his stay here at the former date, and different descriptions of the circumstances of the delivery at the latter. He was examined before a justice of the peace on the 4th April, 1860, and in open Court, on the 16th and 17th January, 1861; and when, on the latter occasion, his attention was called to these discrepancies, he refused to correct or explain them. His testimony can have no weight with us, and plaintiff's case is supported solely by that of the witnesses who testified to the handwriting. To countervail this, we have first the testimony of two witnesses, whose knowledge of the handwriting of John McDonogh is equal, if not superior, to that of any who testified in the cause, and although some of the reasons they give, for pronouncing the paper a forgery, may not have much force, yet they declare in positive terms, and on some very good grounds, that it is not the handwriting of the deceased. Secondly, the testimony of experts and the circumstances developed in the record.

The counsel for defendants seem to have directed their efforts principally to discrediting the *signature* to the "codicil," and for this purpose to rely upon the theory that it was obtained by the process of *tracing*. This appears to have been suggested by the production, by plaintiff himself, of a written lease from McDonogh to one Fernández, dated 1st November, 1846, and the renewals thereof for the three succeeding years, which, it appears, was obtained from said Fernandez by plaintiff, in February or March, 1860, kept by him three or four months, returned to Fernandez, and, after a month or two, again taken by plaintiff and kept by him eight or nine months, until it was produced at the examination of said Fernandez, under a commission, on 24th April, 1861, as a witness in behalf of plaintiff, whose testimony, however, was introduced by defendants, as rebutting evidence.

What object plaintiff had in procuring this lease, retaining it for so long a time, and taking the testimony of this witness, is not explained; and when these incidents are made the basis of a theory prejudicial to his

cause, the want of any attempt at explanation is calculated to give substance to the suspicions awakened, and strengthen the defence. When considered in connection with the facility with which almost any handwriting may be successfully imitated (as shown by this record and the originals accompanying it); the sudden and unexplained appearance of the "codicil" shortly after the possession of the lease; the remarkable similarity in the size and dimensions of the signatures to the two documents, and all the attendant circumstances, so little in accordance with the usual course of human actions, the effect is unfavorable to the genuineness of the instrument propounded as a codicil.

We have before us, in the original, the "codicil," the act of lease and renewals, the original and a duplicate of McDonogh's will, the codicil in favor of A. Pena and two fac-similes thereof, several specimens of accurate *tracings* of different signatures, and many receipts and other genuine writings of McDonogh; from a careful inspection and comparison of all which we cannot determine that the paper presented by plaintiff is in the handwriting of McDonogh; but we are sensibly struck with the uncertainty of all evidence of handwriting, except where the witnesses saw the document written, and the very great care and caution with which it should be received.

The remarkable and almost exact sameness of the size, form and position of each letter, line and flourish or dash in the space occupied by the signature to the propounded codicil; and that to the lease of November 1st, 1846, obtained from Fernandez, renders it not only possible, but probable, that the former was traced from the latter. All the witnesses agree that no two genuine signatures of an individual are ever *exactly* alike, while some of them make it appear that the unusual similarity in this instance can be caused only by tracing. However this may be, there is demonstration before us, in the fac-similes of the "Pena codicil" and tracings of several signatures, that imitations of handwriting, by the process of tracing, can be so accurate as to deceive at least ordinary observers, and we cannot determine whether or not plaintiff's witnesses are deceived in their judgment of the handwriting upon which they testify.

To our own eyesight the body of the writing in question bears the appearance of an imitated handwriting, and is less like the general character of John McDonogh's writing than the signature, and this impression *is not removed* by the testimony adduced in support of the document.

When we consider all the circumstances of this case, as presented in the record—*the delay of nearly ten years*, without a satisfactory explanation, between the death of McDonogh and the presentation of the codicil; the failure to prove plaintiff's alleged relationship to the deceased (which, if it existed, he could certainly have shown *dehors* and in aid of the instrument so persistently assailed); the absence of any motive whatsoever in John McDonogh to make so large a bequest to Moses Fox; the use in the codicil of the term "trustees," found nowhere else in the

writings of the deceased, and which he is shown to have known is not recognized in our law; the inconsistency of the bequest with the sentiments and conduct of his life and the object of his remarkable testament; the existence of other documents purporting to be wills of the deceased and denounced as forgeries; the unexplained possession by plaintiff of the lease of November, 1846, followed by the mysterious appearance of the codicil, the signature to which is so correct a counterpart of the signature to said lease; the positive testimony of two credible witnesses against, and the want of positiveness in that in favor of the instrument sued on, etc.—we do not feel authorized to reverse the judgment of the lower Court and declare the alleged will to be genuine.

Under such circumstances and the countervailing evidence, we think something more is required of plaintiff than a simple conformity to that provision of the law which directs how an olographic will shall be opened and probated. He has instituted suit against parties who have been for years in the quiet possession of an estate, under a will duly proven and executed, and who specially charge that the written instrument, on which his demand is founded, is a forgery, and deny that he is the person described therein.

We are of opinion that the dismissing of the exceptions, and the trial of the cause *on its merits under the pleadings,* devolved on plaintiff the burden of proving *all the allegations* material to his recovery; and that, to determine the genuineness of the paper, which he alleges to be a will or codicil of John McDonogh, the verity of its enunciations as well as the handwriting must be established. He must show that it is the will of the alleged testator, connect it with him, and prove that he is the legatee.

We admit in all its force the doctrine urged by his counsel, that Judges should receive the truth from the hands of the law and in the form which it has established; but it is equally their duty to be fully satisfied that what is offered in such form is *really truth.* It comprehends the principle which this Court is constantly applying, that a plaintiff must make his case not merely probable, but legally certain; and we see no reason why this case should be exempted from its application, but, on the contrary, the most cogent reason for strictly adhering to it.

We do not feel bound to accept a strip of paper as the will of a deceased person, simply because some witnesses say that they believe it to be in his handwriting, while others equally credible say that it is not, and while all the attending circumstances are so utterly inconsistent with its being such.

A majority of this Court do not think that the plaintiff has established with legal certainty, the genuineness of the paper which he alleges to be a will or codicil of John McDonogh.

We deem it unnecessary to pass upon the bills of exception found in the record, as they contain nothing which will make a material change in the effect of the evidence.

37

It is therefore ordered that the judgment of the lower Court be affirmed, with costs.

For the reasons assigned by Mr. Justice HOWELL, I concur in the judgment rendered in this case.

JOHN H. ILSLEY,
Associate Justice of the Supreme Court.

ZENON LABAUVE.

HYMAN, C. J. (dissenting).   Plaintiff sued to have the codicil to the last will of John McDonogh probated and ordered to be executed, and also to have judgment against the cities of New Orleans and Baltimore, as residuary legatees of the deceased, for the amount bequeathed therein to him, with interest and costs.

In the codicil, dated New Orleans, 1st November, 1849, McDonogh bequeathed to his beloved nephew, Moses Fox, the sum of three hundred thousand dollars, to be paid to him eight years after the testator's death, by the trustees of his estate.

Defendants excepted to the form of proceeding adopted by plaintiff in bringing them into Court, and averred that the codicil was a forgery, one of a series of forgeries, perpetrated by a gang of forgers. Subsequently, they agreed with plaintiff that the suit should be placed on the succession docket, tried in its regular order, on its merits, under the pleadings, the question to be determined being the genuineness or forgery of the paper which plaintiff alleged to be a will or codicil of John McDonogh.

The judgment of the Court rejected plaintiff's demand, and decreed in favor of defendants.   Plaintiff appealed from this judgment.

The agreement above named, in my opinion, restricts the contest between the parties to the question whether the codicil is genuine or not ?

If the plaintiff has proven by two credible witnesses that the codicil was entirely written, dated and signed by John McDonogh, and that they so testified because of the knowledge they had of his handwriting, from having often seen him write and sign, there can not be a doubt, without other evidence which entirely disproves this evidence, that the said codicil is fully proven, and that the execution thereof should be ordered, and that effect should be given to its provisions.

Such proof establishes the reality and genuineness of an olographic will, and it is all that the law requires, whether there be a contest about its reality or not.   See Civil Code, Art. 1648.

Plaintiff has so proven the codicil to be genuine by some four or five witnesses.

Other witnesses were introduced by plaintiff to prove the codicil, but

on their stating that they had not seen John McDonogh write and sign, no further questions were asked them.

These witnesses, who proved the codicil, are men of the highest respectability in the State. They had full opportunity for years of knowing the handwriting of McDonogh. Their veracity and accuracy of knowledge have not been questioned.

Against their evidence are introduced two witnesses, who also had full opportunity of knowing the handwriting of McDonogh, whose moral soundness cannot be doubted, but whose inaccuracy in observing facts is not only shown by other witnesses, but is established by their own evidence.

They testify that McDonogh had a peculiar way in signing important documents, and in that way only did he sign them. One of these witnesses after so testifying, produced in evidence some writings of McDonogh, which contradicted his sworn statement.

The manner in which he produced these writings, established the integrity of the man, but the writings proved that his accuracy in observing facts, was deficient. In other respects, these witnesses show that their observations of the acts and conduct of McDonogh were incorrect.

It is unnecessary to enumerate.

From the evidence of these witnesses, it appears that they chiefly base their opinion, that the codicil was not written by McDonogh, because he, in signing important documents, invariably placed two commas under the letter c in his surname, and that in writing on paper he wrote in a peculiar manner. It is only necessary to say that the writings of McDonogh contradicted their evidence, and that such evidence can have little or no weight against the evidence of witnesses, whose accuracy in observing facts have not been questioned. It must be observed here that McDonogh had an immense correspondence, and it is strange that only two persons could be found who as knowing the handwriting of McDonogh, would testify against the reality of the codicil.

Plaintiff introduced the evidence of a man by the name of Cass, to prove that he, Cass, handed to plaintiff the codicil as having received it from McDonogh. This person swears that he received the will from McDonogh to deliver it to plaintiff, and that he only delivered it but a few months before suit was brought thereon. The evidence of this person is so contradictory, that no weight or reliance can be given to it.

The want of reliance in the evidence of this witness does not discredit the evidence of witnesses proving the reality of the codicil. Such reasoning would be strangely absurd; that the testimony of a witness, not reliable should discredit the evidence of reliable witnesses.

Suspicion as to the reality of the codicil is attempted to be drawn from the fact, that plaintiff borrowed at two different times from Fernandez a lease signed by McDonogh. Defendants contend that the codicil was traced from the lease.

The codicil was examined by experienced chirographers, who pronounced under oath that there was no appearance of tracing in the codicil; that the handwriting of the codicil appeared to be genuine. That there was not the stiffness about the handwriting that there would be in tracing.

They pointed out many differences between the signature in the lease and that in the codicil, and declared that the two signatures were not exactly the same. It appears to my inexperienced eye in such matters, that there is difference between the two signatures.'

Defendants offered Dr. Mercier to prove that the codicil was traced from the lease. The doctor not only gave evidence, but made tracings from the signature of John McDonogh.

The chirographers testified that his tracings of the signature of John McDonogh had been unskillfully done.

The tracings of the doctor were presented to our view on the first day of the argument before us, and they appeared to me to be badly executed.

The evidence of the doctor conflicts with that of the chirographers. .

Actual observation of his tracing satisfied me that he was not an adept in tracing; and I do not think that his evidence should have any effect against the evidence of witnesses, whose employment tends to qualify them for judging and testifying in regard to tracing.

The evidence of Fernandez was taken. It established nothing of importance.

The substance of his evidence is, that Fox borrowed the lease twice from him; that he borrowed it some months before the codicil was presented for probate; that he, Fernandez, saw in the year 1840 and 1841, Fox with McDonogh several times in a back yard; that he then knew Fox only by sight; that Fox carried a bundle of keys with him; that he was told by John Grass that the bundle of keys belonged to McDonogh, and that Fox was McDonogh's nephew.

That he heard Fox, after he became acquainted with him, which was several years after McDonogh's death, speak of McDonogh as his uncle.

This evidence does not show for what purpose plaintiff borrowed the lease, and I cannot infer that he borrowed it for the purpose of tracing a forgery, and that the codicil is a forgery traced from the lease, when there is evidence of witnesses (whom the law selects to give evidence in probating a will, who ought to know McDonogh's writing) that it is in the handwriting of McDonogh; and also the evidence of experts that it was not written in the stiff manner in which tracings are done; that it had the appearance of being genuine, and that the letters in the signature in the lease differed from those in the signature of the codicil.

No suspicion in my mind attaches to the codicil from the fact that McDonogh had visionary fancies of perpetuating his name as the benefactor of two cities.

It is quite likely that he did, at some moments, have a feeling of affec-

tion for individuals, so strong as to make him deviate from his settled opinions and purpose. Indeed, there is undoubted and undenied proof that he did so deviate in one instance, and no inference can be made from his views and opinions that he has not so done in another. See *Pena* case, 13 An. 86.

Neither can suspicion attach to the codicil by the use of the word "trustees" therein; for we have before us the written declarations of McDonogh, after he had made his will in favor of the cities, that he did not recollect what term he had used in appointing persons to take charge of his estate after his death.

It not being shown by satisfactory evidence how plaintiff got possession of the codicil, the long delay after the death of the testator before it was presented for probate, and the plaintiff not producing more complete evidence of his relationship with the deceased, may create doubt and suspicion of the reality of the codicil ; but mere doubt and suspicion does not authorize us to declare a will a forgery, after it has been proven to be genuine in conformity to the provisions of law relative to the probate of wills. Neither should we disregard the provisions of law relative to evidence, because it may be possible that the imitation of a handwriting may be so perfect that the deception can not be discovered. We cannot disregard and hold at nought that evidence which the law declares sufficient, on mere suspicion. If the law be defective, the remedy to cure its defects is in legislation.

The codicil of John McDonogh having been duly proved by credible witnesses, as required by Article 1648 of the Civil Code, and nothing but suspicions having been raised as to its want of genuineness, I am constrained to dissent from the decree of the majority of the Court, and to declare that in my opinion the codicil should be probated, and ordered to be executed.

I fully concur with Chief Justice HYMAN, in the foregoing dissenting opinion. ROBT. B. JONES, Associate Justice.