GEORGE B. STITZEL *et al.* Appellees, *vs.* LOREN B. MILLER, Admr. Appellant.

*Opinion filed April 19, 1911.*

1. BILLS AND NOTES—*promissory note defined.* A promissory note may be defined as a written promise by one person to pay to another person named therein, or order, a fixed sum of money at all events and at a time specified therein or at a time which must certainly arrive; and this definition substantially meets the requirements of the Negotiable Instruments act of 1907.

2. SAME—*provision for extension of time after maturity does not render note non-negotiable.* A provision in a promissory note that "in case said note is not paid at maturity, that it is at the option of the holder hereof to extend, as he deems proper, the payment of the above note, and that said extension shall not in any manner release one or either of us from payment hereof," does not render the note non-negotiable, as the negotiability of a note, for all practical purposes, ends when it is due.

3. SAME—*when purchasers may maintain action in their own names.* If a note is negotiable, the endorsement of the name of the payee on its back and its sale and delivery to purchasers authorizes such purchasers to maintain an action in their own names against the administrator of the deceased maker.

4. EVIDENCE—*when genuineness of signature cannot be proved by comparison.* The genuineness of a signature cannot be proved by comparison with other admittedly genuine handwriting or signatures which are not admissible in evidence for other purposes or not already a part of the record; but comparison may be made by the jury, with or without expert testimony, when other writings or signatures admitted to be genuine are already in the case.

5. SAME—*fact that signatures are exactly alike is evidence that one was traced.* The fact that two signatures are exactly alike is

evidence that one was traced or otherwise reproduced from the other or that both were reproduced from still another.

6. SAME—*when evidence to show that signatures are fac similes is admissible.*  Where it is claimed by the administrator in a suit against him on a note that the signature of the deceased was forged, another note purporting to be signed by the deceased, and one payable to and purporting to bear an endorsement by him, may be introduced in evidence, together with the testimony of experts, to show that the three signatures are *fac similes,* without violating the rule against proving handwriting by comparison.

7. SAME—*photographic copy of a note is admissible if proper foundation is laid.*  If a proper foundation is laid by showing that the original instrument, bearing a signature which is desired to be used in evidence, is in the files of a case in a court of another State and that permission to withdraw the instrument has been denied and that it cannot be produced, a photographic copy, shown to be accurate, is admissible.

8. SAME—*what evidence not competent as tending to prove an admission that note was good.*  In an action against an administrator on a note purporting to be signed by the intestate, evidence that the purchaser, at the time he was negotiating for the note, showed it to the defendant and his brother, who were sons of the supposed maker, and asked them if the note was all right and that they made no reply, is not admissible, as their statements or admissions would not be binding upon the other heirs-at-law.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Lee county; the Hon. R. S. FARRAND, Judge, presiding.

TRUSDELL, SMITH & LEECH, for appellant.

H. A. BROOKS, for appellees.

Mr. JUSTICE CARTER delivered the opinion of the court:

This is a suit in assumpsit brought by appellees in the circuit court of Lee county against appellant upon a promissory note dated February 22, 1908, payable one year after date to Harrison Miller and by him endorsed in blank and sold and delivered to appellees. This note was for the principal sum of $6500, with interest at six per cent, and

purported to be signed by D. C. Miller. The appellant filed a special demurrer, charging that the suit was prematurely brought and the note non-negotiable. On the demurrer being overruled the appellant pleaded non-assumpsit, with a verification denying execution of the instrument. Upon a jury trial appellees obtained a verdict for $7140.25. From the judgment entered thereon an appeal was prayed and allowed to the Appellate Court for the Second District. That court affirmed the judgment of the trial court and granted a certificate of importance. This appeal followed.

The original instrument sued on has been certified to this court. A printed blank prepared for the Stocking Trust and Savings Bank was used in making it. Everything is in print except the date, names, amount, time when payable and the rate of interest. The first part is printed in large type and is the ordinary form of promissory note. A power of attorney to confess judgment follows in fine print, and thereafter, in like print, the following: "We also agree that in case said note is not paid at maturity, that it is at the option of the holder hereof to extend, as he deems proper, the payment of the above note, and that said extension shall not in any manner release one or either of us from the payment hereof." It is urged that the quoted words render the instrument non-negotiable. This court has held that a promissory note "may be defined to be a written promise by one person to pay to another person therein named, or order, a fixed sum of money at all events and at a time specified therein or at a time which must certainly arrive." (*McClenathan* v. *Davis*, 243 Ill. 87.) This definition substantially meets the requirements of the Negotiable Instrument act of 1907. The contention that said quoted words gave the holder the authority to extend the note as he pleased; that it could not be known what extensions he might grant, and that therefore the time when the note became due and payable was uncertain and indeterminate, rendering the note non-negotiable, cannot be

sustained. The note·expressly provides that such option to extend can be exercised only upon the failure of the payors to·make payment at its maturity. The time of payment is certain. The note is dated February 22, 1908, and payable one year thereafter. After a note is due its negotiability, for all practical purposes, is at an end. In *Dorsey* v. *Wolff,* 142 Ill. 589, it was held that a provision in a note that if it was not paid when due and suit was brought thereon the maker should pay an attorney's fee of ten per cent, recoverable either in such suit or a separate action, did not destroy the negotiability of the note as it did not take effect until after maturity. Numerous authorities are cited from this and other States by counsel for appellant on this question. In most of them the note recites that the payee reserves the right of option of extension at any time, either before or after maturity, and we do not consider them in point. The quoted words do not affect the character of the note, before or up to its maturity, either in its certainty, amount to be paid, the date of payment or the person to whom the payment is to be made. The clause in question does not destroy the negotiability of the note. The following authorities in other jurisdictions tend to uphold this conclusion: *National Bank* v. *Kenney,* 98 Tex. 293; *First Nat. Bank* v. *Buttery,* 16 L. R. A. (N. S.) N. Dak. 878, and note; *Farmer, Thompson & Helsell* v. *Bank of Graettinger,* 107 N. W. Rep. 170; *Anniston Loan and Trust Co.* v. *Stickney,* 31 L. R. A. (Ala.) 234, and note. The note being negotiable, the endorsement of the name of the payee on its back and its sale and delivery to appellees authorized them to maintain this action in their own names. *Kistner* v. *Peters,* 223 Ill. 607; *Keenan* v. *Blue,* 240 id. 177.

The note matured February 22, 1909. The suit was begun December 19, 1908. The first summons not being served, a second was issued January 23, 1909, and served March 10 of the same year. It is insisted that the suit was prematurely brought. Without question there cannot be

any recovery on an ordinary common law action if the money is not due at the institution of the suit. (*Bacon* v. *Schepflin,* 185 Ill. 122, and cases cited; 1 Ency. of L. & P. 1082.) We think this question was not properly preserved for review.

It is further insisted that the trial court erred in refusing to admit certain other notes for the purpose of showing that the signatures thereon and the signature on the note at issue were *fac similes.* The evidence shows that appellees purchased the note in this suit from Harrison Miller, and at the same time bought of him another note for $4500, also dated February 22, 1908, purporting to be executed by Lafayette Miller and D. C. Miller, payable to the order of Harrison Miller and by him endorsed. Evidence was also offered tending to show that a suit had been brought in the district court of Scott county, Iowa, by L. C. Miller against Ella Quinn, executrix of the estate of James Quinn, deceased, upon a promissory note dated at Davenport, Iowa, September 14, 1907, for the sum of $15,000, purporting to be executed by James Quinn and payable to the order of D. C. Miller, bearing upon the back thereof the purported endorsement in blank of D. C. Miller; that in the said district court of Iowa the name of James Quinn was held to be forged; that appellant had asked but had been refused leave to withdraw said note from the files of that court for use in this trial; that a correct photographic copy, of natural size, had been procured of this note and the back thereof; that on the trial of said case in Iowa the testimony showed that the writing filling up the blanks on the face of that note was in the hand of Harrison Miller. Counsel for the appellant offered said $4500 note and the photograph of the $15,000 note in evidence, and offered to prove by an expert that the purported signature of D. C. Miller on the note here in question, and on said $4500 note, and on the back of the $15,000 note, (as shown by the photograph,) were identical in every particular and if

superimposed would exactly coincide. The court refused
to permit this evidence to be introduced. It is insisted that
if these facts had been shown the conclusion would neces-
sarily have been drawn that the three alleged signatures of
D. C. Miller were all tracings from the same signature.
This court has laid down the rule that the genuineness of
a signature cannot be proved by comparison with other ad-
mittedly genuine handwriting or signatures not admissible
in evidence for other purposes or not already a part of the
record. When, however, other writings or signatures ad-
mitted to be genuine are already in the case, comparison
may be made by the jury, with or without experts. *Him-
rod* v. *Gilman,* 147 Ill. 293; *Rogers* v. *Tyley,* 144 id. 652;
*Bevan* v. *Atlanta Nat. Bank,* 142 id. 302; *Riggs* v. *Powell,*
142 id. 453; *Brobston* v. *Cahill,* 64 id. 356; *Jumpertz* v.
*People,* 21 id. 375; *Massey* v. *Farmers' Nat. Bank,* 104
id. 327.

Counsel for appellant strenuously insist that the offered
evidence does not come within the reasoning of the deci-
sions in this State; that this rule against comparison of
handwriting only applies where it is sought to show that
a signature is like the typical signature of another. A wit-
ness who has seen another write is competent to testify,
as is also one who has acquired a knowledge of the other's
handwriting by correspondence or in the ordinary course
of business. (2 Jones on the Law of Evidence, secs. 559,
561; 1 Greenleaf on Evidence,—Lewis' ed.—sec. 577.) In
a sense all evidence of handwriting is in the nature of
comparison, except where the witness saw the act of writ-
ing. The general rule of the common law was, that proof
of handwriting by comparison, by placing the documents
in juxtaposition, was not permissible. There were, how-
ever, two exceptions that were as well recognized as the
rule itself: First, where writings otherwise irrelevant, of-
fered for the mere purpose of comparison, were admitted
when the writing in issue was so ancient as not to admit

of proof from knowledge derived from seeing the party write; and second, where other writings were legitimately in the case for other purposes. (15 Am. & Eng. Ency. of Law,—2d ed.—265; 3 Wigmore on Evidence, sec. 1991; 1 Greenleaf on Evidence,—Lewis' ed.—sec. 578.) The tendency of legislation, as well as of judicial decisions, is' to relax this rule and to enlarge upon its exceptions, or, rather, to permit a more liberal use of comparison with any writing established to be the writing of the party whose handwriting is in issue, whether the writing is otherwise relevant or not. The rule has been so enlarged in England by statute in 1854 and also by statute in various States in this country. (15 Am. & Eng. Ency. of Law,—2d ed.— 265, 269; see an exhaustive review of this subject in note to *University of Illinois* v. *Spalding,* 62 L. R. A. [N. H.] 817.) The reason generally given for permitting a comparison with writings already in evidence is, that it is better to permit the jury to use such papers for this purpose, under proper instructions, than to confuse them with impracticable distinctions as to their use. The objections originally urged for rejecting proof by comparison of hands were three in number, namely: (1) Illiteracy of jurors; (2) danger of fraud and bias in the selection of a standard of comparison; (3) danger of multiplicity of collateral issues arising from necessity of making proof of the genuineness of the standard. The first objection has long been obsolete. (3 Wigmore on Evidence, sec. 2002.)

Assuming that counsel for the appellees is right in contending that this evidence would involve the principle of a comparison of handwriting, would its admission be in conflict with the decisions of this court on this question? This court has never decided the precise issue here raised, and so far as we are advised the rule insisted upon by appellees has never been enforced where the facts were similar to those in this case. Indeed, in the record that we have of the celebrated *Howland will case,* 4 Am. L. Rev. 625, the

trial court there seems to have gone much further in the admission of evidence bearing on traced or forged signatures than is here contended for by the appellant. In discussing the question of the comparison of handwriting by bringing the documents into juxtaposition, Chief Justice Shaw, in *Moody* v. *Rowell,* 17 Pick. 490, said: "It seems to be difficult to distinguish, in principle, between the case of .a paper admitted or proved to be genuine, given in evidence for another purpose, and a paper, the genuineness of which is equally well established, when offered for this express purpose. In both cases the result depends upon skill and judgment in making the comparison and discovering the resemblances and differences." The dangers arising from the admission of such papers are greatly minimized where the writings admitted are conceded by the opposite party to be genuine or he is estopped from denying them. (1 Greenleaf on Evidence, sec. 581.) If such comparison will lead to the ends of truth and justice when the papers are admitted in evidence for other purposes, there is much force in the argument that any evils that may be suggested as arising from the selection of particular writings for the purpose of comparison may be left, as all such evidence must be, to be corrected by other evidence or the individual judgment of the jury. (*Morrison* v. *Porter,* 35 Minn. 425.) In *University of Illinois* v. *Spalding, supra,* it is said (p. 825): "It may be safely stated as a fundamental proposition that on the question whether a given signature is in the handwriting of a particular person, comparison of the disputed signature with other writings of that person known to be genuine is a rational method of investigation, and that similarities and dissimilarities thus disclosed are probative, and as satisfactory in the instinctive search for truth as opinion formed by the unquestioned method of comparing the signature in issue with an exemplar of the person's handwriting existing in the mind and derived from direct acquaintance, however little, with the party's hand-

writing." That this court concurs in this reasoning is shown in *Greenebaum* v. *Bornhofen,* 167 Ill. 640, where, in discussing the evidence as to comparison of handwriting, it was said (p. 645) : "In considering the issue the court might, and should, compare the signatures of the papers so in evidence, as a means of determining whether the disputed signatures were genuine. * * * Of this means of determining the truth the Appellate Court and this court are deprived. That it was a most important and valuable aid is certain. It may have afforded the most convincing proofs that the signatures were genuine."

While we are not disposed to overrule or set aside the holdings of this court as to the comparison of writings placed in juxtaposition, we are convinced that on reason and authority the rule should not be made more rigid. On the contrary, it should be liberally construed, so as to serve as an "important and valuable aid" in determining the genuineness of signatures. The reason of the rule is not against the comparison of the signatures in different documents by bringing them together in order to show the genuineness or falsity of the signature, but it is against the selection of a false standard as the characteristic type or style of handwriting and bringing before the jury collateral issues. No danger of unfairness of selection could arise from the introduction of the offered evidence. If the signatures offered are *fac similes* they cannot vary. They would be like the work of a printing press or typewriter when working accurately. There would be no opportunity for an arbitrary selection and no chance to choose between the signatures of different kinds. Only signatures that are identical can be of any value for the purpose for which these documents were offered. The proof of *fac simile* signatures can hardly raise collateral issues. In attempting to prove a disputed signature by a genuine typical one the standards offered may be innumerable, and each one offered must be proved to be genuine or its genuineness admitted.

Not only must the standards be shown· to be genuine, but their weight as evidence will depend upon whether they are typical. No such danger is liable to arise in attempting to prove *fac simile* signatures. The number offered must, in the nature of things, be limited. A comparison to establish a type of handwriting differs from a comparison to reach a conclusion as to whether two signatures are identical. The two methods of comparison are clearly distinguishable. In seeking to prove that signatures are identical in every respect, the óbject of the comparison is precisely the opposite of that usually sought. In other words, in the ordinary case of comparison it is sought, from the similarity or dissimilarity of the disputed writing compared with the genuine one, to show whether the disputed writing is genuine or a forgery, while in a case like this it is sought to prove the forgery of a signature by establishing the fact that the disputed signature is so nearly identical with other signatures that it must be a forgery,—that is, that the disputed signature was traced from another by some process. The authorities generally agree that no two signatures of an individual written in a natural way will be the same in all respects. The fact that two signatures are exactly alike is accepted as strong evidence that one was traced or otherwise reproduced from the other or that both were made from still another signature. *Day* v. *Cole,* 65 Mich. 129; *Kemp* v. *Mackrill,* Sayre, (K. B.) 130; *Hanriot* v. *Sherwood,* 82 Va. 1; *Taylor will case,* 10 Abb. Pr. (N. S.) 300; *McDonough's Succession,* 18 La. Ann. 419; 1 Moore on Facts, sec. 607.

The disputed evidence did not involve the doctrine of the comparison of hands in the sense in which that rule has been followed in this State. The offered proof is similar in some respects to that which was held competent in *Brooks* v. *Tichbourn,* 14 Jur. 1122, to show that Brooks was the author of a disputed writing in which the name of Tichbourn was misspelled "Titchbourn." Other letters of Brooks were

offered in the lower court in which the name was misspelled in the same way. The reviewing court said: "It was objected, however, that the mode of proof of that habit was improper, and that the habit should be proved as the character of handwriting is, not by producing one or more specimens and comparing them, but by some witness who is acquainted with it from having seen the party write or corresponded with him. But we think that is not like the case of the general style and character of handwriting. The object is, not to show the similarity of the form of the letters and mode of writing a particular word or words, but to prove a peculiar mode of spelling a word, which might be evidenced by the plaintiff having orally spelt it in a different way from others, or written it in that way once or oftener, in any sort of characters,—the more frequently the greater the value of the evidence. For that purpose one or more specimens written by him with that peculiar orthography would be admissible."

It has never been doubted that the authorship of a writing might be shown by other circumstances than the likeness or unlikeness of one handwriting to that of another, as by the character of spelling or style of composition. Such a fact does not come within the rule governing proof as to the likeness or unlikeness of handwriting. Proof of such peculiarities may be made in any way that would be appropriate in other cases. In *Pate* v. *People,* 3 Gilm. 644, the prosecuting witness, Randall, testified that a receipt and contract described in an indictment were never executed by him, and he proceeded to point out wherein the style of writing and spelling differed from his own. For the purpose of contradicting him the prisoner introduced other papers written and signed by Randall which corresponded in these particulars with the documents alleged to be forged. The court held that this evidence was proper, and that the prosecution then had the undoubted right to rebut this testimony and sustain Randall by show-

ing that the papers introduced by the prisoner and traced to his possession previous to the trial were originally written as stated by Randall but had since been made to resemble the forged writings by alterations and erasures. Incriminating letters written on a typewriting machine, not signed, were offered in evidence against a defendant in a criminal case, their genuineness being shown by evidence that in the town where they were mailed a machine was found that had defects that would produce the same character of writings that were found in the letters. (*State* v. *Freshwater,* [Utah] 85 Pac. Rep. 447.) This court has held that it was proper to prove by an expert that two instruments were written by the same person, holding that the question was not whether the two writings resembled each other, but whether, in the opinion of the expert, they were written by the same person. (*Rogers* v. *Tyley, supra.*) In a prosecution under the United States statutes against the slave trade it became necessary for the prosecution to show the citizenship of the vessel employed for that purpose. The vessel had been originally owned by one Marsden and engaged in a legitimate business. Just prior to embarking in the slave trade it appeared to have been registered in the name of one Gray. The theory of the prosecution was that Marsden was still the real owner and that Gray was a fictitious person. The prosecution sought to prove this by showing that the name "Gray" on the register was a simulated one and not signed by Gray; that no such person as Gray lived. It was sought to prove this by introducing other signatures and comparing them with the name "Gray" signed on the register. The signatures introduced were not claimed to be genuine signatures of Gray but were ostensibly those of other persons connected with the vessel. It was claimed that they were all written by the same person, and the prosecution offered testimony of experts to that effect. It was argued that the rule regarding the comparison of hands applied and that the evidence

should not be admitted. The court, in overruling the objection, stated that if the purpose of the offer had been to show by comparison that the signature "Gray" was in the handwriting of defendant, it would be necessary to have in evidence, as a standard of comparison, the genuine signature of the defendant, but that the purpose there was to show the circumstance that all of these papers, ostensibly signed by different persons, were in fact written by the same person, and from this circumstance draw the inference that they were spurious and that "Gray" had not signed the registry. (*United States* v. *Darnaud,* 25 Fed. Cas. 14,918.) In *Anson* v. *People,* 148 Ill. 494, it was held competent to prove in a forgery case impressions of a notarial seal to show that the impression on the instruments purported to be forged was made by that same seal. The following authorities also tend to uphold the contention that the offered evidence did not strictly involve the doctrine of comparing hands, but was a species of circumstantial evidence to be admitted for the purpose of showing a plan to forge a series of notes or papers: *Blalock* v. *Randall,* 76 Ill. 224; *United States* v. *Chamberlain,* 25 Fed. Cas. 14,778; *State* v. *Webb,* (Utah) 56 Pac. Rep. 159; *Levy* v. *Rust,* 49 Atl. Rep. 1017; *Sudlow* v. *Warshing,* 108 N. Y. 520; *Tally* v. *Cross,* (Ala.) 26 So. Rep. 912; *Balcetti* v. *Serani,* Peake's Cas. 192; 1 Wigmore on Evidence, secs. 304, 315, 318.

*Fac simile* signatures necessarily resemble the genuine signature of the person. Honest witnesses must testify that the handwriting is similar, and many will be constrained to testify that the purported signature is genuine. If evidence of the nature here offered be excluded, the reputed signer being dead, frequently the best evidence that could be produced to show a traced signature would be excluded. It could hardly be said that any better evidence could be offered to show that a signature was a *fac simile,* except that of persons who actually saw the tracing done.

The admission of the testimony offered would not, in our judgment, conflict with the rule heretofore laid down by this court as to comparison of handwriting by documents placed in juxtaposition, and we are not disposed to extend that rule so as to preclude, under proper restrictions, this character of testimony.

As we understand the record, proper proof was made that the original note for $15,000 sued on in Iowa could not be produced on this trial, and the photographic copy, preliminary proof as to its accuracy having been made, was proper evidence. (Rogers on Expert Testimony,—2d ed.—336.) This photographic copy of the $15,000 note and the original note of $4500 should have been admitted in evidence for the purpose of aiding the jury in reaching a conclusion as to whether the three signatures in question were all *fac similes*. These writings being admissible, expert testimony was permissible to aid in deciding as to whether they were *fac similes*. *Rogers* v. *Tyley, supra;* 15 Am. & Eng. Ency. of Law, (2d ed.) 276; 2 Jones on Evidence, sec. 570; *University of Illinois* v. *Spalding, supra,* note on p. 869.

Evidence is found in the record of an interview by one of appellees with Loren B. Miller, the administrator, and his brother, Clark Miller, when appellees were negotiating for the purchase of the two notes of $6500 and $4500, to the effect that said appellee showed the notes to the two Millers and asked them if they were all right, and they made no reply. We think this evidence was incompetent and should have been excluded. The two Millers could not bind the other heirs-at-law by any admissions or statements they might make.

We find no error in the giving and refusing of instructions.

The judgments of the Appellate and circuit courts will be reversed and the cause remanded to the circuit court for further proceedings not inconsistent herewith.

*Reversed and remanded.*