THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CLINTON SMITH, Plaintiff in Error.

*Opinion filed June 18, 1925—Rehearing denied October 9, 1925.*

1. CRIMINAL LAW—*when motion to quash indictment will not be considered.* A motion to quash the indictment after the defendant has entered a plea of not guilty cannot be considered unless leave is obtained to withdraw the plea.

2. SAME—*act of 1921 providing penalty for injury to person or property by explosives is valid.* The act of 1921 "to punish persons for destroying property, or inflicting injury to persons, by means of any bomb, dynamite or other explosive, or by means of any similar instrument or implement," does not violate section 13 of article 4 of the constitution, providing that no act shall embrace more than one subject.

3. SAME—*when letters impounded for comparing handwriting are not inadmissible as privileged communications.* Letters written by the defendant long before the commission of the crime with which he is charged and secured and properly impounded by the State's attorney for the purpose of comparison with an anonymous letter acknowledging the commission of the offense are admissible for the purpose of comparison, only, and the fact that they were written to lawyers with whom the defendant formerly had business and some of whom had represented him in litigation does not render them incompetent as privileged communications, where there is nothing in the contents of the letters prejudicial to the defendant.

4. SAME—*what writings are admissible as standards of comparison to prove handwriting.* The act of 1915 providing for the proof of handwriting by comparison with writings properly in evidence and treated as or admitted to be genuine (Smith's Stat. 1923, p. 1011,) is not limited to writings properly in the files or record of the case, but the intention of the statute is to permit in evidence as standards of comparison any writings admitted or proved to be genuine and properly impounded, as provided therein.

5. SAME—*State's attorney may be assisted by outside counsel.* The court may permit counsel employed for that purpose to assist the State's attorney in the prosecution of a defendant.

6. SAME—*when contents of an alleged letter cannot be proved.* The court may refuse to permit the defendant to testify to the contents of an anonymous letter he claims to have received on the day of his arrest, where the letter is not produced and its loss or destruction is not accounted for.

WRIT OF ERROR to the Circuit Court of Coles county; the Hon. J. H. MARSHALL, Judge, presiding.

J. FRED GILSTER, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, CHARLES H. FLETCHER, State's Attorney, and C. F. MANSFIELD, (E. C. CRAIG, and F. H. KELLY, of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Clinton Smith, plaintiff in error, (hereafter called defendant,) was indicted by the grand jury of Coles county for feloniously, willfully and maliciously damaging the residence occupied by Charles C. Lee and family in Charleston, Coles county, Saturday night, May 10, 1924, by means of dynamite or some explosive the name of which was to the grand jurors unknown. He was tried, convicted and sentenced to the penitentiary and has sued out this writ of error.

Charles C. Lee is a lawyer residing in Charleston, Coles county. He had some time prior to the damage to his residence, as an attorney for Joe Rogers, secured a judgment against Smith for $6000 for alienating Rogers' wife's affections and had collected the judgment. The night of May 10, Lee, a little girl he had adopted, and a niece, were occupying the residence. About 12:25 A. M. he and the other occupants of the house were aroused by a loud explosion, which tore away porches, cracked and broke stone, broke windows, and damaged the brick walls and plastering of the building. None of the family were injured. He found a hole under the porch floor about two and one-half feet deep and a hole in the sitting room wall about a foot in diameter. All together the house was pretty badly damaged. It was heavily shaded by trees and there was no light at that street intersection. Lee had no idea who had exploded the bomb and did not think it was intended for

him. He said it was undoubtedly a mistake, and so stated
to neighbors who quickly gathered at his house. May 25
he received an anonymous letter. The letter was as follows:

"*Mr. C. C. Lee*—There was no mistaken identity. We tried to
kill your wife and girl. We watched you in the east room where
you read a book until about 9 o'clock. We still expect to get re-
venge. If your wife ever comes back we will kill or cripple her
and the girl and then in a few years we will kill you, you black-
hearted thief. Give this to some detective or P. O. inspector but
you will see your family die just the same.

"To kill you outright would let you off to easy.

"You must pay the price."

A few days after Lee received the letter he saw defend-
ant on a street in Charleston. Defendant called Lee, who
stopped and defendant came up, facing him. Lee testified
defendant said: "I want to know if you are going to pay
me my money back; if you don't I am going to collect in
blood." Witness said, "That is what you were trying to do
when you bombed my house, was it?" Defendant said,
"Don't you accuse me of doing that or I will smash you."
Witness said, "No, you won't smash me; you are the one
who is going to get smashed; a man can't do what you
have done and make this kind of talk and not get into
trouble and plenty of it." Defendant said, "I will have
my money back or I will collect in blood." Witness said:
"I will pay you nothing; I don't owe you anything; I never
did do anything to you but what I had a legal right to do."
Defendant said: "Oh, yes, you did; you all went into
a conspiracy against me and bought Charlie Jones on the
jury." Witness said, "You are talking foolish talk like a
school boy; you know I didn't do a thing like that in my
life." Defendant said, "Well, you will pay me my money
back or I will collect in blood," and then turned and went
away. Lee said he came fast and went away fast; that when
he got between the cars, as he was going away, he turned his
head around and said, "You remember, I am going to have
my money back or collect in blood." Lee said, "You will

get nothing off of me," and defendant was gone.  Lee testified he showed the anonymous letter to the State's attorney and his assistant; that he never suspected defendant of bombing his house until he had received the anonymous letter and had the talk with him; that he filed a complaint and caused him to be arrested after receiving the letter and having the talk.

The evidence abundantly shows Lee's house was wrecked by the explosion of dynamite under one of the porches. Wiley, the deputy sheriff who arrested defendant, said he had a talk with him that night and asked him where the dynamite was, and he said it was in the hog house.  Later in the night the witness went to defendant's house and secured a small pine box containing dynamite.  It was overhead in a building, but the witness did not know whether it was a hog house or not.  He found fuses in another place, wrapped in a piece of paper, and found caps in another place.  There were eight sticks and one part of a stick of dynamite.  There were about twenty-five or thirty feet of fuse and four or five caps.  The witness testified he had had experience with dynamite, and that the fuse would take forty or fifty seconds to burn a foot.  A. J. Pleshner, a mine engineer of eighteen or twenty years' experience with dynamite, examined the fuse, caps and dynamite found on defendant's premises and introduced in evidence.  He explained the method used in exploding the dynamite, and testified the fuse would burn a foot in from thirty to forty seconds and a yard in from ninety to one hundred twenty seconds.  If damp it would burn a little slower.  W. J. Williams, supervisor of explosives for the Madison Coal Company, testified to the same effect.

The anonymous letter received by Lee on May 25 was introduced in evidence, together with the envelope in which it was received.  The envelope was marked Exhibit A and the letter Exhibit B.  It was the theory of the State that

defendant wrote the anonymous letter to Lee, and about two weeks prior to the trial the State's attorney having secured from different sources other letters written by defendant, gave notice that he would move the court to impound the letters for use on the trial as standards of comparison of defendant's handwriting. A hearing was had on the motion before the court, at which defendant and his attorney were present. The court heard evidence and the parties entered into a stipulation that the writings sought to be impounded, marked Exhibits 6 to 11, were genuine and were the genuine handwriting of defendant. Upon the evidence and the stipulation the court ordered the writings impounded with the clerk for the purpose of establishing standards of comparison of writings of defendant on the trial. At the trial the People introduced in evidence the anonymous letter to Lee and the envelope it was received in. The People then introduced Exhibits 6 to 11, to which defendant's counsel made a general objection. Counsel for the People inquired whether defendant would waive their reading to the jury. Defendant's counsel replied they were introduced only for comparison; that they could not be taken to the jury room but could only be looked at by the jury. The court remarked it was not necessary to read the exhibits, as their purpose was for use in comparing handwriting, and that the jury might look at them for that purpose.

Defendant testified in his own behalf that he was in Charleston the forenoon of May 10. He went home about ten o'clock and returned to Charleston that night. He did not notice the hour when he returned, but the street lights were on when he arrived there. He went home and went to bed, he thought, between eleven and twelve o'clock. He remained at home the balance of the night. He testified to seeing Lee in Charleston afterwards and to having a talk with him. He said he asked Lee if he (Lee) had been telling that witness had dynamited his house. Lee said he

didn't have to say.   Witness then said to Lee, "You went into a conspiracy with my lawyer and bought old Charlie Jones on the jury and beat me, and now you have got to let me alone; if you don't you will have to pay for it; if you don't keep off of me you will pay either in money or in blood."   Lee said, "What are you going to do besides what you have already done?"   Witness said, "What do you mean?"   Lee said, "What you did about bombing my house."   Witness said, "I didn't do anything, and if you say I did I will smash you right here."   Lee said, "You will not do that; you are talking foolish now; that is plumb foolish; I never done anything like that in my life."   Witness said, "You will let me alone or you will pay for it," and walked off and left Lee.   That conversation was June 7. That night Wiley and Decker came to defendant's house and arrested him and took him to Charleston, to the State's attorney's office.   Someone there said defendant's house ought to be searched for dynamite.   Defendant said there was no dynamite in the house but there was some in the hog house.   He testified he bought twenty-five pounds of dynamite, caps and fuse in February for the purpose of blowing out stumps.   He blew out some but could not tell how many sticks he used.   He denied he had anything to do with the explosion at Lee's house and denied writing the anonymous letter to Lee.   He testified he received an anonymous letter June 7; that the letter was not in his possession at the time he testified and he did not know where it was; that he knew part of the contents,—the substance of the letter.   He was asked to tell what the contents of the letter were, and the court sustained objections of the People to his doing so.   Counsel for defendant then demanded the State's attorney produce the letter, and charged that he or Wiley had it.   The State's attorney denied he ever saw or heard of such a letter.   On cross-examination defendant testified he did not like Lee; that he had charged him with entering into a conspiracy with defendant's lawyer

and buying juror Charlie Jones in the Joe Rogers case, which was tried in October, 1921. He admitted telling Lee at Charleston, June 7, if Lee did not let him alone he was going to pay in money or blood. He testified his home is six or seven miles south and a little east of Charleston; that he drove a four-cylinder, two-seated car to Charleston the night of May 10; that he was by himself; that in the early part of the evening he went to a movie theatre and must have left about 9:30; that he carried no watch; that the dynamite, caps and fuse introduced in evidence looked like the kind he had at home; that he bought them in February and kept them in the hog house loft; that he knew the officers had a warrant for him when they arrested him but did not know what the charge was when they took him from his home. Defendant was a single man and lived with his mother.

Ellen Smith, defendant's mother, testified she and her son lived on a farm. She is seventy years old. They lived about seven miles from Charleston. She was at home Saturday night, May 10, 1924. She awoke that night between eleven and twelve o'clock with a spell of heart trouble and called defendant and had him start a fire. She looked at the clock and it was five minutes after twelve. She told the circumstances of the arrest of defendant the night of June 7. On cross-examination she testified she did not know what time defendant got home the night of May 10. It was getting dark when he left home and witness went to bed about eight o'clock. She did not hear him come in. He would have to pass through her bed-room to go to his bed, but she was asleep and did not hear him. After defendant built the fire for her he went to bed and she did not see him any more that night. She fixed the date by a field meet held May 10. She has heart trouble, and there is not a day that she doesn't have a spell. She didn't know before June 7 that her son was accused of dynamiting Lee's house. Recalled by defendant, she testified that Wiley and

Decker came back after arresting her son,—she thought near two o'clock. They got a few letters from defendant's wardrobe and also got some dynamite.

Ross Hutton testified he farmed land adjoining defendant's. He saw defendant dynamiting stumps on about an acre of ground on defendant's farm.

Mrs. J. O. Eubanks testified she saw defendant in the theatre in Charleston Saturday night, May 10. She could not say what time it was. She left the theatre before defendant left it.

J. A. Hutton testified he is a farmer and lives ten miles south of Charleston and about two miles from the house of defendant. He was handed Exhibits 6 to 11 and said he had seen them before,—especially Exhibit 6. He was asked if in his opinion the person who wrote Exhibit 6 wrote the anonymous letter. The People objected on the ground that witness had shown no qualifications better than the jury possessed for answering that question. The objection was sustained. Afterwards, in answer to a question, he testified he could read and write some; that he studied the Spencerian system of writing when he went to school; that he wrote checks; that he never saw defendant write and never saw any writings which defendant admitted to him he had written; that he never made a study of handwriting. He was then asked by defendant's counsel whether in his opinion the person who wrote Exhibit 6 wrote People's Exhibits A and B. Counsel for the People objected, and the court inquired of defendant's counsel whether he thought the witness was qualified to give the jury any assistance, and counsel replied, "There is some question about it, I will admit." The court ruled the witness was not competent to testify.

It is contended by defendant that the court erred in overruling a motion to quash the indictment; that defendant was overwhelmed by outside counsel representing the People; that witnesses were wrongfully permitted to testify

whose names had not been furnished defendant; that counsel for the People made wrongful and prejudicial remarks during the trial; that the court erred in permitting incompetent testimony and refusing to permit competent testimony; also in giving instructions for the People and modifying and refusing instructions for defendant.

Counsel who represents defendant in this court did not represent him and was not present at the trial, and many objections argued in defendant's brief were not preserved for review by objections made during the trial or were not mentioned in the motion for a new trial or are not mentioned in the assignment of errors. In view of that fact we shall not take the time to discuss many of the questions argued in defendant's brief.

We will first mention the motion to quash the indictment. There is a dispute whether any written motion to quash was ever filed. It was not marked filed by the clerk, but defendant contends, and supports the contention by affidavits, that a written motion was made, and after it was overruled was deposited with the clerk, and after the trial was found by him in a drawer in his office but had no filemark on it. It appears from the record that defendant entered a plea of not guilty before any motion to quash the indictment was made and that the plea was never withdrawn. A motion to quash after plea cannot be considered unless leave is obtained to withdraw the plea. (*People v. Munday,* 280 Ill. 32; *McKevitt* v. *People,* 208 id. 460.) While that is true, we have investigated the objections made to the indictment and are convinced the court did not err in overruling the motion to quash. We will therefore not further discuss the objections of defendant to the sufficiency of the indictment.

One of the grounds of the motion for a new trial was that the statute under which defendant was indicted and convicted is unconstitutional. The constitutional provision which the statute is alleged to violate is section 13 of arti-

cle 4, which provides that no act shall embrace more than one subject, and that shall be expressed in the title. The statute was adopted in 1921 and contains three sections. Its title is, "An act to punish persons for destroying property, or inflicting injury to persons, by means of any bomb, dynamite or other explosive, or by means of any similar instrument or implement." The first section provides what punishment shall be administered to anyone who damages or injures, by dynamite or other explosive, any building designed for human occupancy. The second section provides the punishment to be administered to anyone who shall injure or damage any building designed for human occupancy by means of dynamite or other explosive and thereby injure any human being. The third section provides that anyone who stands by, aids or assists, or who, not being present, advises or encourages the perpetration of the crime, shall be considered a principal and be punished accordingly. There is no merit in the contention that the statute is unconstitutional. *People* v. *Joyce,* 246 Ill. 124; *People* v. *Sargent,* 254 id. 514; *People* v. *O'Brien,* 273 id. 485; *People* v. *McBride,* 234 id. 146.

During the hearing before the court on the motion to impound the writings, defendant's counsel objected to them on the ground they were letters from defendant to his lawyers and were privileged communications. The court held that objection was not good, and after the conclusion of the hearing on the motion to impound, made an order, based upon the evidence and the stipulation of the parties, that the writings be impounded with the clerk for the purpose of establishing standards of comparison of writings on the trial of the case.

It is very strongly urged by defendant that the court erred in admitting Exhibits 6 to 11 in evidence on the trial for use as standards of comparison of handwriting. The exhibits were letters written by defendant, before Lee's house was bombed, to lawyers with whom he had business

and in no way related to Lee or to any trouble with him. Nothing contained in the language of the letters was prejudicial to defendant. They were secured by the State's attorney to be used on the trial in comparing their handwriting with the handwriting of the anonymous letter received by Lee on May 25. That the letters were in the genuine handwriting of defendant was admitted by defendant and his counsel. At the hearing of the motion of the State's attorney to impound the writings defendant was present in person and by counsel. His counsel objected to the use of the letters in evidence on the ground they were letters from defendant to his attorneys and were privileged communications. Counsel also stated there might be something in the letters prejudicial to defendant. The court said he would exclude any which contained anything prejudicial to defendant, but otherwise they would be received for the purpose of using them as standards of comparison on the trial. All this took place approximately two weeks before the trial of defendant. On the trial counsel for the People offered the letters written by defendant, which had been impounded with the anonymous letter received by Lee, "to be used as standardizations of handwriting admitted by the defendant to be his handwriting." Counsel for defendant said, "We object." It was not then or at any time on the trial objected that the letters were privileged communications. It is now claimed they were; that they were erroneously received in evidence for the purpose of comparison, and that the ruling of the court is preserved for review because that objection was made on the hearing of the motion to impound them, about two weeks before the trial. We do not think the position of counsel for defendant is correct. It was necessary, in order to preserve the question, that when the letters were offered on the trial the specific objection should have been made; but however that may be, our decision of the case does not depend upon whether the ruling was preserved or not.

The question of the admissibility of the letters is a rather curious and interesting one. The rule is well understood that communications between attorney and client are regarded as confidential. Here the letters of defendant were to lawyers with whom he formerly had business and some of whom had represented him in litigation, and contained no statement that had any bearing whatever upon his guilt or innocence of the crime he was charged with. They were written long before that crime was committed. They did not mention or refer to Lee. The purpose of using them on the trial was only for comparison in proving handwriting. It was believed by the People that defendant wrote the anonymous letter of May 25 to Lee. The State's attorney secured the letters (Exhibits 6 to 11) from the persons to whom defendant had written them, and the object of using them on the trial was for comparison with the anonymous letter and having witnesses who had had large experience in observing different handwritings examine and compare them with the anonymous letter and express their opinion as to whether the anonymous letter was written by defendant. The jury were permitted to examine the writings, but they were not read to the jury and were not taken by them on their retirement to consider the case. The People proved by three witnesses, who were all officers of banks of which defendant was a customer, that they had seen defendant write and were acquainted with his handwriting; that the anonymous letter was, in their opinion, written by defendant. Five other witnesses who were not familiar with defendant's handwriting, three of them bank officers and two handwriting experts, testified they had compared Exhibits 6 to 11 with the anonymous letter received by Lee and expressed the opinion that all of them were written by the same man. We believe the letters were competent for the purpose they were used.

Defendant contends that the letters were admitted in violation of the rule that handwriting cannot be proved by a

comparison of handwritings of the party proved or admitted to be genuine. In 1915 the legislature passed an act (Smith's Stat. 1923, p. 1011,) of which section 1 reads: "That in all courts of this State it shall be lawful to prove handwriting by comparison made by the witness or jury with writings properly in the files or records of the case, admitted in evidence or treated as genuine or admitted to be genuine, by the party against whom the evidence is offered, or proved to be genuine to the satisfaction of the court." Section 2 provides that before a standard of writing shall be admitted in evidence for comparison, reasonable notice shall be given. Section 3 provides that reasonable opportunity to examine the proposed standards shall be given the opposite party, his attorney and witnesses, and the court may impound the writing with the clerk of the court for that purpose. The construction of the statute contended for by defendant is that only writings properly in the files of the case, which are admitted in evidence or treated as genuine, or admitted or proved to be genuine, can be admitted in evidence as standards of comparison, and that writings not properly in the files or records of the case can not be admitted as standards of comparison. The statute establishing the rule applies to the trial of criminal cases. (*People* v. *Clark,* 301 Ill. 428.) In that case the question here presented was not directly raised, but the court construed the statute as not limited to writings properly in the files or records of the case. If given the construction contended for by defendant it would nullify the statute. The intention of the statute was to permit in evidence as standards of comparison, writings admitted or proved to be genuine which had not theretofore been admissible in evidence. *Stitzel* v. *Miller,* 250 Ill. 72, and *Craig* v. *Trotter,* 252 id. 228, were decided in 1911 and the statute under discussion was adopted in 1915. Those cases, as well as the language of the act, clearly show the purpose of it was to permit writings not properly in the files or records of the case, ad-

mitted or proved to be genuine, to be admitted as standards of comparison to prove handwriting.

Hutton, a witness for defendant, did not qualify to express an opinion as to handwriting. Defendant's counsel, in reply to an inquiry by the court, expressed his doubt as to the witness' qualification to testify. The court did not err in refusing to permit him to testify.

The criticism of instructions given for the prosecution and the modification and refusal of instructions for defendant is of a highly technical character and without merit. Only nine instructions were given for the People, and instructions in substantially the same language as practically all of them have been approved by decisions of this court. The modification made of defendant's instructions did not prejudice him, and the instructions refused did not correctly state the law or were covered by other instructions given. Defendant has no just cause of complaint of the court's action in giving, refusing or modifying instructions.

Two outside counsel assisted the State's attorney in the prosecution of the case but no objection was made at the trial to their doing so, and that point was not mentioned in the motion for a new trial and is not raised in the assignment of errors. Besides, we have repeatedly held a court may permit counsel employed for that purpose to assist the State's attorney. *People* v. *Donaldson,* 255 Ill. 19; *People* v. *O'Farrell,* 247 id. 44; *People* v. *Hartenbower,* 283 id. 591.

Defendant claims, but does not argue the point, that the court erred in refusing to permit defendant to state the contents of an anonymous letter he claimed to have received June 7, the day of his arrest. The letter was not produced, and its loss or destruction was not sufficiently proved to permit oral proof of its contents.

No question of the court's permitting witnesses for the People to testify whose names had not been furnished the defendant is preserved, and there would be no merit in that contention of defendant if it had been preserved.

Some other complaints are made, but the questions were not preserved for review and none of them are of a character which would justify a reversal of the judgment.

The record is free from substantial error. The question of defendant's guilt of the crime was fairly and properly submitted to the determination of the jury. A consideration of the evidence convinces us that a reviewing court would not be justified in reversing the judgment.

The judgment is affirmed.         *Judgment affirmed.*