[Crim. No. 2661.   First Dist., Div. One.   Nov. 2, 1950.]

THE PEOPLE, Respondent, v. WOODROW NORWOODS, Appellant.

George R. Baird and Booth B. Goodman for Appellant.

Fred N. Howser, Attorney General, and Clarence A. Linn, Deputy Attorney General, for Respondent.

WOOD (Fred B.), J.—Defendant appeals from a judgment entered upon a verdict convicting him of violating section 474 of the Penal Code, the unlawful sending by telegraph of two false and forged messages purporting to be from another person, knowing the same to be false and forged, with the intent to deceive, injure and defraud. He also appeals from the order denying his motion for a new trial.

At the trial, appellant admitted that on September 6, 1947, he sent two messages by telegraph from Oakland to San Diego, California; each in the name of Lester Sandbergen as sender; one to L. B. Grant reading, "First note of Woodrow Norwoods has been paid and settled. Norman Seltzer has signed note of *some*. Norwoods owes $1420.00 plus $130.00 *bonous* total $1550.00 Will be forced to appear against you if suit is carried out. Letter following"; the other to himself, the appellant, reading, "Have notified L. B. Grant to dismiss paid debt See you soon."

The messages had reference to a suit then pending in San Diego, which Grant had brought for the collection of loans in the amount of $2,520 which Sandbergen claimed to have made to appellant and had assigned to Grant for collection purposes, with power to collect, sue, compromise and discharge the same. Of that amount, the sum of $920 was evidenced by an I O U of appellant dated June 19, 1946; and the sum of $750, by a promissory note of appellant dated October 16, 1946. Grant was pressing appellant for payment. Norman Seltzer, mentioned in the message to Grant, was appellant's attorney in that suit.

Appellant claimed that Sandbergen authorized him to send these messages and to send them in the name of Sandbergen. He testified that he drove to Oakland the night of September 5, 1947, went to Sandbergen on the morning of the 6th and appealed to Sandbergen to get appellant out of the "mess" he was in, saying that Grant was on appellant's neck and was going to chase him out of town; that thereupon Sandbergen picked up a piece of paper, wrote on it, gave it to appellant,

directing the latter to go to a Western Union office and send the two telegrams, one to Grant and one to appellant, each in the name of Sandbergen; that Sandbergen gave appellant five dollars to cover the cost of sending the telegrams, and a receipt for the five dollars; that appellant went to a Western Union office, handed the messages to a clerk, who told him that the messages had to be written on company forms; that appellant wrote the telegrams on company forms, according to what Sandbergen had written, and placed them for transmission; and that, a month or so later, Sandbergen gave appellant an authorization signed by Sandbergen, authorizing appellant to sign Sandbergen's name to these telegrams.

Sandbergen testified that at the time the telegrams were sent his suit against appellant was pending and he wanted it to "go through"; that he did not write or send or sign his name to the telegrams, nor did he write out the substance of those telegrams, nor did he authorize anyone to write or send them or sign his name to them; that he did not see appellant on the 5th, 6th, or the 7th of September, 1947; that appellant never talked to him about that suit in September, 1947, nor at any time after Sandbergen came to Oakland from San Diego except in April, 1947; that the only time he saw appellant in Oakland was in April, 1947; that he did not at any time give appellant an authorization to send the telegrams, nor did he at any time give appellant five dollars to send the telegrams or any telegram.

The errors which appellant assigns are (1) the admission in evidence of photostatic copies of portions of the "receipt" for five dollars and the "authorization" to sign Sandbergen's name to the telegrams, and testimony concerning the authenticity of the signatures appended to those documents, and (2) that neither of the telegrams was intended to, nor could it, nor did it, deceive, injure or defraud anyone, according to appellant's view of the facts and the law. Neither point is well founded.

As to the evidence which appellant claims was erroneously admitted, it is clear from the record that the originals of the "receipt" and the "authorization" were, prior to the trial, delivered by appellant to his attorney, by him to the district attorney, and by him to the witness Sherwood Morrell, Examiner of Questioned Documents for the California State Division of Criminal Identification. After examination of these documents, Morrell returned them to the district attor-

ney, who redelivered them to appellant's attorney, who returned them to appellant.

At the trial, appellant testified he did not know where these documents then were; that if he did know he would be glad to produce them; that he would like very much to get them but did not know where he could find them; that he had looked all over for them; that before the preliminary examination he gave them to his attorney in Oakland, later picked them up and took them back to San Diego to his San Diego attorney, but could not recall whether he left them with his San Diego attorney or with Sandbergen. Earlier during the trial, the district attorney demanded that appellant produce the receipt. Appellant's attorney replied, ''We don't have such a receipt.''

Thereafter, in connection with the testimony of the witness Morrell, respondent produced photostatic copies which Morrell had made of the receipt and of a portion of the authorization, including the purported signature on each, the negative used in making the photostatic copies, and two photostatic enlargements of the signatures appearing on the receipt and the authorization.

The photostatic copy of the receipt bears date ''Sep 1947'' and recites ''Received from Lester Sandbergen five dollar'' (the next few letters are obscured by a tag placed upon it during the process of photostating) ''grams to'' (followed by the word ''dollars'' in print) ''L.B. Grant,'' and bears the purported signature ''Lester Sandbergen.'' To the left of the signature appear the figures ''$5.00.''

The photostatic copy of the authorization shows, above the purported signature ''Lester Sandbergen'' the words in typewriting ''suit and the money that N'' (the next few letters are obscured by a tag placed upon the document in photostating) ''wes me is held in escrow by George R. Baird, U. S. Commissioner.'' The negative of this photostat shows these words above the signature, ''Nor Woods to send telegrams, one to L. B. Grant, San Diego, California, to dismiss the suit filed against Nor Woods. I will not appear against Nor Woods in any suit and the money that N'' (the next few letters are obscured by a tag placed upon the document in photostating) ''wes me is held in Escrow by George R. Baird, U. S. Commissioner.''

The witness Morrell, after qualifying as a handwriting expert, testified that he made these photostatic copies and enlargements from the documents furnished him by the district attorney.

Appellant objected to their introduction upon the grounds that they were not the best evidence, that they were but portions of documents, that the originals were not in evidence, that neither the documents nor their contents were in evidence. Respondent stated they were being offered in respect to the signatures on them, whereupon the court overruled the objection and admitted them in evidence.

This ruling we deem correct. The originals, and their unavailability, were sufficiently accounted for by the appellant, who last had possession of them. The fact that the photostats were not complete copies of the text of the originals seems immaterial. The photostats were adequately identified as facsimiles of the questioned signatures and of sufficient of the writing above the signatures to show the substance of the "receipt" and the "authorization." They were complete copies of those portions of the documents (the signatures) in respect to which they were offered.

The expert witness Morrell testified that he compared the signatures on those two documents, the "receipt" and the "authorization," and that in his opinion they were traced signatures of Lester Sandbergen; that the common denominator was a good and genuine signature of Sandbergen; that these two were but carbon copies; that he arrived at the determination that they were tracings upon the ground that no one can write his signature exactly alike in all respects on two occasions; that there are too many lines and formations of letters for that to happen; that by placing glass gauges over the signatures he found that almost all of the points in those particular signatures occurred in exactly the same place under the squares in both signatures. There was observable a slight difference between the ending strokes of the letter "r" in the word "Lester" and in the "n" in the word "Sandbergen." He had no explanation as to why that happened except that these were carbon copies and he believed that whoever did the tracing probably did not finish the ending strokes in both instances in exactly the same manner. The rest of the points in all the letters occurred in exactly the same position, indicating to the witness, and it was his opinion, that no one could write his signature that closely on two different occasions, and therefore this had to be a tracing from a common denominator or a common signature; that one signature somewhere was used as a pattern for both of these.

This expert testimony went in without further objection by

appellant; i.e., he stated that his objection to the admission of the photostats went to this testimony. This objection did not expressly invoke those provisions of section 1944 of the Code of Civil Procedure (which appellant now invokes) that declare that evidence respecting handwriting may be given by a "comparison, made by the witness or the jury, with writings admitted or treated as genuine by the party against whom the evidence is offered, or proved to be genuine to the satisfaction of the judge." Such an objection, even if timely made, is not apt. Morrell's was not the testimony of a witness "by a comparison . . . with writings admitted or treated as genuine . . . or proved to be genuine." His was the testimony of an expert, "his opinion on a question of science, art, or trade, when he is skilled therein" (Code Civ. Proc., § 1870, subd. 9), based upon his examination and comparison of the two questioned signatures, not the comparison of either of them with a signature admitted, treated or proved to be genuine. Such expert testimony seems clearly admissible. In holding admissible expert testimony that the signatures on three different promissory notes were identical in every particular, the Supreme Court of Illinois, in *Stitzel* v. *Miller,* 250 Ill. 72 [95 N.E. 53, Ann.Cas. 1912B 412, 34 L.R.A.N.S. 1004], observed that "A comparison to establish a type of handwriting differs from a comparison to reach a conclusion as to whether two signatures are identical. The two methods of comparison are clearly distinguishable. In seeking to prove that signatures are identical in every respect, the object of the comparison is precisely the opposite of that usually sought. In other words, in the ordinary case of comparison it is sought, from the similarity or dissimilarity of the disputed writing compared with the genuine one, to show whether the disputed writing is genuine or a forgery, while in a case like this it is sought to prove the forgery of a signature by establishing the fact that the disputed signature is so nearly identical with other signatures that it must be a forgery—that is, that the disputed signature was traced from another by some process." (P. 57 [95 N.E.].) (See, also, 62 L.R.A. 817, 870; 7 Wigmore on Evidence, 3d ed., § 2026, p. 235.)

It is true that after giving the testimony which we have summarized Morrell was asked if he made further comparisons of these signatures with other signatures, and Morrell said he had, that he had numerous signatures in this case of Mr. Sandbergen; but he was not asked if, nor did he

testify that, his opinion concerning the genuineness of the signatures on the "receipt" and the "authorization" was based upon any comparison other than his comparison of the two questioned signatures.

Appellant's contention that neither of the telegrams which he sent in Sandbergen's name was intended to or could or did deceive, injure, or defraud anyone, is predicated, principally, upon appellant's claim that, after Sandbergen's assignment to Grant and prior to the filing of the suit, the indebtedness sued upon was compromised and settled. There was testimony that the day after Sandbergen assigned the claim to Grant appellant requested Sandbergen to take the claim out of Grant's hands; that thereupon Sandbergen and appellant signed a memorandum agreement which placed in escrow three checks of appellant for $1,450, $100 and $2,000, respectively, payable to Sandbergen and deliverable to the latter upon the occurrence of certain events described in the memorandum, which purported to be in full settlement of all claims by Sandbergen against appellant to that date; and that at the same time Sandbergen wrote Grant a letter stating he had decided to take no further action on his claim against Norwoods and to consider the assignment to Grant terminated and the claim withdrawn from Grant's hands, and requesting Grant to return all notes and papers which Sandbergen had left with Grant, adding that his claim against appellant had not been paid and that he had merely decided not to proceed. All that happened in December, 1946, prior to the filing of the suit and long prior to the sending of the telegrams in September, 1947. Nevertheless, appellant argues that even if Grant had, in response to the telegrams, dismissed the suit (which he did not), neither Grant nor Sandbergen would or could have suffered any loss or injury, for the suit was groundless and neither of them could have prevailed in it. This contention misses the mark. The validity of the indebtedness sued upon and of any of appellant's defenses thereto are suitable for determination in a civil action between the parties, not in this criminal proceeding. We may note, in passing, that the asserted compromise and settlement were made after Sandbergen's assignment to Grant and after notice to appellant of that assignment; that Grant claimed an interest under the assignment; and that Sandbergen questioned the validity and effect of the asserted settlement and desired his civil suit to "go through." It is patent that appellant was very desirous

of getting Grant to dismiss the suit or otherwise desist. He made a special trip from San Diego to Oakland and sent the telegrams with the intent and in the hope of accomplishing that objective. Such a change of position by Grant would have been to his and Sandbergen's detriment and injury, however great or however slight, and is not to be measured here by the putative validity or invalidity of the claims which Grant and Sandbergen were asserting against appellant in the civil suit. ■ The expression "intent to deceive," used in section 474, is broader than the expression "intent to defraud," used in section 470 of the Penal Code, and is not limited to an act whereby one does or may suffer financial loss. (*People* v. *Chadwick*, 143 Cal. 116, 119-121 [76 P. 884].) ■ The fact that Grant refused to act in reliance upon the telegrams is immaterial. (*People* v. *Danford*, 14 Cal.App. 442, 448 [112 P. 474].).

Nor is appellant correct in his suggestion that the telegram which he sent to himself was true and could not deceive anyone. That telegram declared that Sandbergen had notified Grant to dismiss. That was untrue, Sandbergen never having given Grant such a notice. It was a message which might deceive Grant if exhibited to Grant by appellant (the addressee) as confirmation by Sandbergen of the instructions contained in the telegram to Grant. If Grant were to act in reliance thereon, both he and Sandbergen would be injured.

The falsity of the telegrams inhered in the fact that neither of them represented or expressed the views, purposes or intent of Sandbergen, whose name was appended to them without his knowledge or consent.

The judgment and order appealed from are affirmed.

Peters, P. J., and Bray, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 30, 1950.